CASEY PELLICER, BY HIS GUARDIAN AD LITEM, ARELI PELLICER AND ARELI PELLICER, INDIVIDUALLY, PLAINTIFFS–RESPONDENTS, v. ST. BARNABAS HOSPITAL AND SAM EDELMAN, M.D., DEFENDANTS, AND J. RUE, R.N., NOW KNOWN AS JEAN SMOGARD–RUE, DEFENDANT–RESPONDENT, AND D. KROPILAK, R.N., NOW KNOWN AS DELPHINE ANDERSON, R.N., ANNE OLESNICKY, M.D., MICHAEL VALLEE, M.D. AND NORMAN ZEIG, M.D., DEFENDANTS–APPELLANTS.

Argued November 5, 2008—Decided July 23, 2009.

---

24 

*Kevin T. Coughlin* argued the cause for appellant Anne Olesnicky, M.D., (*Coughlin Duffy* and *Porzio, Bromberg & Newman*, attorneys; *Mr. Coughlin, Timothy P. Smith* and *Vito A. Gagliardi, Jr.*, on the briefs).

*Louis A. Ruprecht* argued the cause for appellant D. Kropilak, R.N., now known as Delphine Anderson, R.N., (*Ruprecht, Hart & Weeks*, attorneys).

*Joseph L. Garrubbo* argued the cause for appellant Michael Vallee, M.D., (*Garrubbo, Capece, D'Arcangelo & Millman*, attorneys).

*Catherine J. Flynn Tafaro* argued the cause for appellant Norman Zeig, M.D., (*Lindabury, McCormick, Estabrook & Cooper*, attorneys; *Ms. Flynn Tafaro, Monica Vir* and *Sergio D. Simoes*, on the brief).

*R. Scott Eichhorn* argued the cause for respondent J. Rue, R.N., now known as Jean Smogard–Rue, R.N., (*Marshall, Dennehey, Warner, Coleman & Goggin*, attorneys).

*Craig M. Rothenberg* argued the cause for respondents Casey Pellicer and Areli Pellicer (*Rothenberg & Pashaian*, attorneys; *Mr. Rothenberg* and *Robert E. Taylor, Jr.*, on the briefs).

*Philip S. Goldberg* submitted a brief on behalf of *amicus curiae* American Tort Reform Association.

*E. Drew Britcher* submitted a brief on behalf of *amicus curiae* Association of Trial Lawyers of America–New Jersey (*Britcher, Leone & Roth*, attorneys; *Mr. Britcher* and *Jessica E. Choper*, on the brief).

*Charles X. Gormally* submitted a brief on behalf of *amicus curiae* Medical Society of New Jersey (*WolfBlock*, attorneys; *Mr. Gormally* and *Anthony M. Juliano*, on the brief).

*Ross A. Lewin* submitted a brief on behalf of *amicus curiae* New Jersey Hospital Association (*Drinker Biddle & Reath*, attorneys).

Justice HOENS delivered the opinion of the Court.

This matter involves a tragic series of events in which the infant plaintiff Casey Pellicer, then recovering from surgery at defendant St. Barnabas Hospital, was disconnected from a respirator and suffered severe brain damage. In the medical malpractice trial that followed, his mother, plaintiff Areli Pellicer, asserted that his injuries were caused by doctors and nurses who were involved in his post-operative care and by the hospital's inadequate protocols and training. Each defendant denied liability.

After a lengthy trial, the jury returned a verdict that included $50 million for pain, suffering, and loss of enjoyment of life, as well as sizeable compensatory awards. This appeal requires us to consider several issues, including whether the verdict was excessive, whether the selection process resulted in a jury that was biased, and whether the trial was tainted by cumulative error.

### I.

The facts on which the trial was based, although complex, need only be summarized[1] in order to give context to the issues we address. In doing so, we focus on the assertions made among the parties concerning their theories of liability for the infant plaintiff's injuries.

### A.

The infant plaintiff Casey Pellicer was born with spina bifida, a congenital spine defect. On September 25, 1998, when he was four months old, he underwent spinal surgery at defendant St. Barnabas Hospital to remedy certain aspects of that condition. The specifics of that underlying congenital condition and of the

---

[1] This recitation is compiled from the extensive trial testimony. For reasons that will become apparent, the times when events occurred occasionally are estimated due to a loss of evidence from the cardiac monitoring strips.

surgery are not germane to the issues we are called upon to address because the focus of the litigation was on injuries that plaintiffs assert were sustained by the infant plaintiff during a brief time frame after the surgery itself was performed.

Following the surgery, the infant plaintiff was moved into the Pediatric Intensive Care Unit (PICU). During that transport, an anesthesiologist used a standard procedure referred to as "bagging" to manually force air into his lungs through an endotracheal tube. After the infant reached the PICU, that manual procedure stopped, and his endotracheal tube, which was secured by tape to his mouth, was connected to a ventilator. Defendant Delphine Anderson, a registered nurse who was primarily responsible for the infant's care, and defendant Jean Rue,[2] a PICU nurse, were assigned to care for him in the PICU, and his mother, plaintiff Areli Pellicer, was also present in the PICU room.

At approximately 9:50 p.m., Anderson left the room to get tape because she believed that the endotracheal tube was not secure. While Anderson was out of the room, the infant turned his head, and his mother called out because she thought that the tube had been dislodged. Anderson immediately returned to the room along with Rue. According to a monitoring strip, at 9:56 p.m., approximately at the time when the infant turned his head, he had an episode of brachycardia, that is, a very low heart rate, but his oxygen saturation rate was normal.

Anderson and Rue, seeing that the infant was lying on his stomach and that he had turned his head from one side to the other, moved his head back to its original position. They then listened to his lungs, heard breathing sounds, and concluded that the tube had not become dislodged. The nurses then turned the infant onto his back, disconnected the ventilator, and began to manually bag him through the tube, because manually bagging a patient can be more effective than using a ventilator.

_____

[2] Defendant Rue is also referred to in the appellate proceedings as Jean Smogard–Rue.

Rue again assessed the position of the infant's tube and determined that it was still in place. Nonetheless, at some point thereafter, the infant's heart rate dropped so low that Anderson began performing chest compressions on him. At approximately the same time, Rue administered the drug Norcuron, a paralytic which deprives one of the ability to move and breathe independently, to the infant. The doctor's orders permitted that drug to be given in case of "severe agitation," which referred to either head movement or coughing against the ventilator. Prior to Anderson's departure from the room and prior to the administration of Norcuron, there is no dispute that the infant had been breathing, at least in part, on his own without the assistance of the ventilator and that the administration of Norcuron prevented that from continuing.

Shortly after the drug was given, at approximately 9:58 p.m., the infant's heart rate dropped to fifty to sixty beats per minute, at which point Rue left the room and telephoned defendant Sam Edelman. He was the on-call pediatric intensivist, which is a subspecialist trained to care for critically ill children. Rue called him because she wanted someone who could assess the infant's airway and who could also, if necessary, extubate, that is remove the tube, or reintubate, that is reinsert the tube if it had become dislodged. Edelman was on his way home, but as soon as he received the call, he began driving back to the hospital.

At the time, St. Barnabas had a code 222 red policy, which governed certain emergencies including immediate or impending cardiac arrest or respiratory arrest. Certain health care professionals could call a code, but an attending nurse, such as Anderson, was primarily responsible for alerting the staff to make the call. Pushing a call button located in the PICU room would immediately summon the code team, consisting of: an attending pediatric intensivist; a pediatric hospitalist, who is a pediatrician specializing in the care of hospitalized children; an emergency room attending physician or senior pediatric resident; a nursing supervisor; and the patient's nurse.

On the night in question, defendant Anne Olesnicky was the on-call resident anesthesiologist. She had only completed two-and-a-half months of her first year of residency and was only qualified to intubate an adult. Olesnicky testified that she had been trained to call an attending anesthesiologist in labor and delivery for assistance if an infant intubation were needed. She had never been in the PICU before.

Defendant Michael Vallee, who was an attending anesthesiologist and the coordinator of the anesthesiology residency program, and defendant Norman Zeig, who was the chairman of the anesthesiology department and the director of residency training, both confirmed that Olesnicky had been trained to call the attending anesthesiologist in labor and delivery if she needed assistance. Vallee testified that Olesnicky was also instructed to call a code if the attending physician was not available.

However, both Vallee and Zeig testified that the anesthesiology department was not responsible for providing the PICU with coverage by an anesthesiology resident. As a result, they both contended that they would not expect Olesnicky to be called to any PICU room. Instead, Vallee and Zeig testified that a pediatric intensivist would be called to the PICU to deal with an infant's airway management problems. In contrast, Anderson and Rue, the two nurses, testified that it was their practice to call the anesthesia department if the intensivist was not available and that resident anesthesiologists other than Olesnicky had reintubated infants when called.

At about 10:00 p.m., Olesnicky was paged to report to the PICU "right away." She arrived at approximately 10:02 p.m., listened for breath sounds, and checked the infant's vital signs. Although she determined that she was not trained to manage the situation, she did not tell anyone else in the PICU that she was not qualified to intubate the infant. Instead, she gave an unidentified male staff member the beeper number of the attending labor and delivery anesthesiologist and asked that the doctor be paged immediately. While awaiting his arrival, Olesnicky took over

manually bagging the infant. She testified that the infant's oxygen levels increased dramatically, which reassured her that the tube had not been dislodged and that he could be ventilated adequately through it.

At approximately 10:05 p.m., Edelman, who was en route to the hospital, called and spoke to Rue, who reported the infant's vital signs to him. Rue testified that she then returned to the infant's room and made a "general announcement" that Edelman had "said to reintubate." According to Rue, Olesnicky did not respond, except to say that she heard breath sounds. Olesnicky then ordered that the infant be given Atropine to increase his heart rate.

Although Edelman soon called and spoke with Rue for a third time, the phone connection was lost after Rue relayed the infant's vital signs to him. Rue then returned to the room and asked Olesnicky why she had not reintubated the infant. Olesnicky, who Rue described as calm and competent, explained that she had "heard breath sounds." According to Rue, when she asked whether Olesnicky was comfortable with the situation or whether Rue should call a code, Olesnicky said that she was comfortable but asked that the labor and delivery anesthesiologist be summoned.

At approximately 10:10 p.m., Olesnicky again asked Rue to call the labor and delivery anesthesiologist and also asked her to contact the neonatology department. She then ordered that the infant be given a second dose of Atropine, in spite of which his heart rate again declined. At approximately 10:12 p.m., another medication was administered to the infant, resulting in a briefly increased oxygen saturation level. Less than two minutes later, however, the infant's heart rate and oxygen saturation rate both fell so low that Anderson began performing chest compressions on him.

It is undisputed that by that time, which was approximately 10:14 p.m., the infant had suffered irreversible brain damage. Even so, medical personnel continued their efforts, apparently unaware that it was too late. At approximately 10:16 p.m.,

Edelman, who was still en route to the hospital, called for a fourth time, and Rue again reported the infant's vital signs to him. Olesnicky administered another drug to increase the infant's heart rate because his oxygen saturation rate had decreased to "somewhere in the 40s," and his heart rate had decreased to about forty beats per minute.

At approximately 10:18 p.m., Dr. Robert Ciolino, the attending labor and delivery anesthesiologist, arrived in the PICU. Seeing that the infant had turned blue, he reintubated him immediately, as a result of which the infant's heart rate and oxygen saturation levels increased. Edelman arrived at the PICU shortly after Ciolino. By then, however, the damage to the infant's brain, caused by post-operative oxygen deprivation, was irreversible.

The injuries suffered by the infant plaintiff are severe. He sustained a hypoxic ischemic encephalopathy, which is a brain injury resulting in cortical blindness. In addition, he has spastic quadriparesis and global developmental delay. That is, he suffers from significant intellectual, verbal, and neuro motor deficits. Although through the years that have passed since his injury he has made a great deal of physical progress and has achieved numerous developmental milestones, he faces a lifetime during which he will need substantial, round-the-clock, care.

## B.

Prior to the trial that resulted in the verdict on appeal,[3] plaintiffs settled their claims against the hospital and proceeded against the nurses and doctors.[1] Their claims, and the arguments urged by defendants in response, can be summarized as follows.

---

[3] For reasons explained in Part I.C., *infra,* the trial that resulted in the verdict followed the declaration of a mistrial. Our recitation of the parties' contentions will therefore be limited to the legal theories presented to the jury that rendered the verdict.

[1] At the close of the evidence, the court dismissed the claims against Edelman. Because that decision was not appealed, we need not discuss plaintiffs' theories of liability against him.

Plaintiffs argue that Anderson deviated from the applicable standard of care by leaving the infant's room to get tape, assisting Rue in giving Norcuron, and failing to initiate a code. Anderson defends by asserting that she did not deviate from any applicable standard of care.

Plaintiffs assert that Rue [5] deviated from the standard of care by giving Norcuron rather than another drug that would not have prevented the infant from breathing on his own and by failing to summon the labor and delivery anesthesiologist promptly when asked to do so by Olesnicky. Rue contends that she appropriately followed the doctor's order to give Norcuron when the infant began moving as a part of her attempt to prevent him from dislodging the tube.

Plaintiffs argue that Olesnicky deviated from the standard of care in several respects, including: failing to request that the labor and delivery anesthesiologist be called as soon as she arrived in the PICU at 10:02 p.m.; delaying any request for help until 10:10 p.m.; failing to inform PICU personnel that she was not qualified to reintubate the infant; and declining Rue's offer to call a code.

Olesnicky initially argued that the injury occurred prior to her arrival in the PICU, but that position was based on a reconstruction of the timeline that largely was undercut by the discovery of the cardiac monitoring strips. She asserts, in the alternative, that she should never have been summoned to the PICU because she was not qualified to assist there. In addition, she contends that she complied with the applicable standard of care by asking, both immediately and repeatedly, that labor and delivery personnel be paged; by treating the infant with medications to increase his heart rate; and by assisting with ventilation efforts. She argues

---

[5] The jury verdict exonerating Rue was not appealed by plaintiffs but was challenged through cross-appeals filed by defendants. Before this Court, Rue responded to the petitions for certification by arguing that the jury verdict absolving her should not be overturned.

that she did not deviate from the standard of care by failing to call a code or by declining Rue's offer to do so. She asserts that she had not been trained to call a code and that, if she had, it would only have summoned the others she had already asked be paged.

Plaintiffs argue that Vallee and Zeig deviated from the applicable standard of care by failing to have a qualified anesthesia resident available to respond to a call from the PICU and in failing to train Olesnicky adequately about how to respond to the emergency there. Vallee and Zeig assert that the hospital intensivist, rather than the anesthesiology department, was responsible for the PICU and that they had no reason to anticipate that Olesnicky would be called there or to train her, in the early months of her residency, in how to respond to a PICU emergency.

## C.

Approximately two weeks after the trial began, on June 21, 2004, St. Barnabas [6] alerted the parties and the court that it had, for the first time, learned that there were documents in the hospital file that had not been copied and disclosed during discovery. Specifically, counsel explained that he had met with Anderson, during which time she reviewed the original hospital file, rather than the copy of the file that had been given to all parties during discovery. During that review, she found that the infant plaintiff's cardiac monitoring strips, which recorded his vital statistics throughout the night at issue, had been folded and taped down inside of the file.

In making this disclosure to the court, counsel for St. Barnabas explained that he had been unaware that the strips were in the hospital's possession, pointing out that the copy of the hospital file he had been given at the start of the litigation did not include a copy of the page with the folded version of the strips or a copy of

---

[6] Throughout the first trial, counsel for St. Barnabas also represented both of the nurses who had been named as defendants in light of their status as hospital employees.

the strips themselves. All of the parties had prepared their cases based on each defendant's reconstruction of the evening's events from recollections, notes, or other information.

The trial continued after the discovery of the original strips as the parties evaluated [7] how this more accurate evidence would affect the issues. Eventually, it became apparent that the strips could not be copied successfully or completely. Portions had faded because of the type of ink used, other parts had been obliterated by the tape, the strips had been cut apart and re-taped in the copying process making some of the times recorded on each strip indecipherable, and several of the strips were lost.

After this evidence was produced, Olesnicky moved for a mistrial, arguing that the new material was crucial to her defense. Prior to the discovery of the monitoring strips, she had used other sources of information to reconstruct what had happened and when. Based on that information, her experts had concluded that the infant plaintiff had already been injured before she arrived in his room. In light of the contrary information that the monitoring strips revealed about the timing, she argued that a mistrial was necessary to her ability to mount a defense. The court granted that motion, imposing sanctions on the hospital for the costs that its discovery violation had caused.

The second trial, which forms the basis for the issues before this Court, began in October 2004. Shortly before it started, St. Barnabas settled [8] with plaintiffs, and new counsel appeared for each of the two nurses.

---

[7] The discovery of the monitoring strips, and the manner in which it would be addressed, was overshadowed, to some extent, by the impending liquidation of one of the hospital's insurers and considerations about the need for separate counsel for each of the two nurses.

[8] Because the hospital's insurance policy also covered the other defendants who were acting in its employ, part of the settlement agreement addressed those claims. That is, the hospital's $11 million payment was accompanied by an agreement to cap liability of the other defendants at its total coverage limit. The verdict did not exceed that agreed-upon ceiling.

Following a lengthy trial, the jury rendered its verdict in favor of plaintiffs, attributing liability as follows: Anderson, ten percent; Olesnicky, fifty percent; Vallee, fifteen percent; and Zeig, twenty-five percent; and absolving Rue of any liability. The jury awarded the infant plaintiff damages in the amounts of: $1.6 million for future lost wages; $10.5 million for future life care needs; and $50 million for pain, suffering, disability, and loss of enjoyment of life. In addition, the jury awarded damages in favor of plaintiff Areli Pellicer in the amount of $162,000 for past services she had performed; $432,640 for services she would perform until the infant's twenty-second birthday; $132,500 for future services to be performed by her thereafter; and $13,140,000 for loss of the infant plaintiff's services, care, and companionship. The total award, therefore, was $75,967,140 in damages.

During post-trial motions, the trial court set aside the award to plaintiff Areli Pellicer for loss of the infant's services, care, and companionship, concluding that an award on that theory could not be supported as a matter of law. In all other respects, the court denied the motions of defendants for new trial or, in the alternative, for remittitur. After calculating prejudgment interest and molding the verdict to exclude that aspect of the award that the court had set aside and to account for the jury's percentage of fault evaluation, the trial court entered judgment in the amount of $70,891,781.59 in favor of plaintiffs.

### D.

Defendants Olesnicky, Anderson, Vallee, and Zeig appealed, raising a multitude of issues before the Appellate Division. Although the specifics of their arguments will be addressed more fully as necessary, the essence of the issues raised on appeal is that the trial court's inappropriate jury selection methodology, along with numerous other rulings during the trial, were biased and unduly prejudicial and that these errors, individually or cumulatively, deprived defendants of their right to a fair trial,

inappropriately inflamed the jury, and resulted in a verdict that was both excessive and punitive.

In an unpublished opinion, the Appellate Division rejected those arguments and affirmed. In summary, the panel concluded that the trial court did not abuse its discretion in conducting the jury selection process and that, although there were some improprieties, in particular in plaintiffs' counsel's closing argument, they were not of such magnitude, individually or in the aggregate, to have deprived defendants of a fair trial. Finally, the panel disagreed with defendants that the jury verdict was sufficiently excessive to warrant interference or relief.

## II.

Defendants Olesnicky, Anderson, Vallee, and Zeig included numerous points in their separate petitions for certification. Some of the arguments are raised by several defendants, others are unique to a single defendant, and all of them overlap to some extent. For our analytical purposes, they can be organized into three general categories, and we will address them in that manner.

First, defendants assert that the quantum of the pain and suffering award, which vastly surpassed any prior verdict, was so grossly excessive that it cannot be sustained. More specifically, they argue that on its face it demonstrates that the jury was influenced improperly by inflammatory appeals and motivated by an inappropriate desire to punish defendants rather than fairly compensate plaintiffs.

Second, they argue that the jury selection process utilized by the trial court tainted the entire panel and thereby deprived defendants of a fair, unbiased, and impartial jury. In particular, they argue that by conducting all inquiries of potential jurors about their pre-existing biases against defendants and similar health care providers or facilities in open court, rather than at sidebar, the jurors who were eventually selected were exposed

repeatedly to irrelevant and prejudicial views that interfered with their ability to decide the issues fairly and impartially.

Third, they point to a lengthy and wide-ranging assortment of events and rulings during the trial that operated, either individually or cumulatively, to deprive them of a fair trial. Although a detailed list is not necessary for purposes of this summary, defendants point to a variety of examples of tactics employed by plaintiffs' counsel, with the permission of the trial court, including: disparagement of one of their experts based on his ethnic heritage and his work experience; inflammatory assertions that defendants would profit financially if the infant plaintiff were to die; and accusations that defendants hid or destroyed evidence. Separately, they assert that the trial court erred by precluding defendants from offering expert testimony and evidence relating to use of an annuity to fund the life care plan; singling out one defendant's closing for sua sponte criticism for using a phrase that plaintiffs' counsel had earlier used without a similar rebuke; refusing requested curative instructions or proposed jury charges; and permitting plaintiffs' counsel to employ an inflammatory tone throughout the proceedings. Defendants argue that, singly or collectively, those errors entitle them to a new trial.

We granted each of defendants' petitions for certification. 193 *N.J.* 586, 587, 940 *A.*2d 1219 (2008). We thereafter granted motions permitting the New Jersey Hospital Association, the American Tort Reform Association, and the Medical Society of New Jersey to participate as amicus curiae.

III.

Defendants' arguments are interrelated. In particular, the first contention, that the verdict was the product of a jury overcome by bias, cannot be addressed in isolation because our evaluation of that question is intertwined with the other assertions that the jury selection process resulted in a panel that was tainted from the start and that there were numerous other errors during the trial that individually or cumulatively deprived defendants of a fair

trial. We therefore consider the assertions concerning the jury selection process and the claims of trial error before evaluating whether the verdict is so shocking and excessive that it cannot stand.

We begin our analysis by addressing defendants' argument that the jury selection process itself infected the entirety of the proceedings and led to an unjust or excessive verdict. The standards that govern our review of jury selection are well-established. As we have described it, "a trial court must see to it that the jury is as nearly impartial as the lot of humanity will admit." *State v. Williams*, 113 *N.J.* 393, 441, 550 *A.*2d 1172 (1988) (internal quotations omitted). The right to a fair and impartial jury is a "fundamental . . . [one that is to be] jealously guarded by the courts." *Wright v. Bernstein*, 23 *N.J.* 284, 294, 129 *A.*2d 19 (1957). Our Appellate Division has echoed these principles, recognizing that litigants are entitled to an unbiased jury and to a fair jury selection process. *Catando v. Sheraton Poste Inn*, 249 *N.J.Super.* 253, 259, 592 *A.*2d 294 (App.Div.) (noting that, although most reported cases on jury bias arise in context of appeals from criminal convictions, civil litigants also are entitled to unbiased jury), *certif. denied*, 127 *N.J.* 550, 606 *A.*2d 364 (1991).

We have long relied on our trial court judges to ensure that the selection of jurors is conducted in a manner that will effectuate these rights. "The chief responsibility for conducting jury selection rests with the trial judge." *State v. Wagner*, 180 *N.J.Super.* 564, 567, 435 *A.*2d 1190 (App.Div.1981) (citing *State v. Manley*, 54 *N.J.* 259, 255 *A.*2d 193 (1969)). Although we have not adopted a specific formula to govern voir dire, *see State v. Biegenwald*, 126 *N.J.* 1, 594 *A.*2d 172 (1991), the process is not unguided. The examination of jurors, for example, is governed by *Rule* 1:8–3(a), which provides in pertinent part that "[f]or the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath." *Ibid.*

More importantly, we have embraced jury selection methods[9] that, although not required to be used at the time when this jury was selected, nonetheless are designed to ensure fairness.

■ In implementing the process of screening and selection, the trial judge is vested with discretion to decide whether to conduct questioning of particular jurors in open court, while the prospective juror is seated in the jury box, or to conduct the examinations of each of them, or any of them, separately at sidebar. *See State v. Smith,* 55 *N.J.* 476, 483, 262 *A.2d* 868 (finding it within trial court's discretion to prohibit counsel from making challenges for cause at sidebar), *cert. denied,* 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.2d* 256 (1970); *Priolo v. Compacker, Inc.,* 321 *N.J.Super.* 21, 29, 728 *A.2d* 239 (App.Div.1999) (noting that decision to hear matters in open court or at sidebar is within trial court's discretion).

■ In civil litigation, the inquiries needed to uncover hidden bias of a potential juror may be wide-ranging and open-ended. Questions designed to determine whether a particular individual might have a prior experience that would interfere with the fair and unbiased performance of the role of juror often focuses on each juror's views about the general subject matter of the trial, the specific parties, and the larger interest, trade, or professional groups to which the parties may belong.

■ More to the point, particularly in matters like this one, involving personal injuries and medical procedures, the questions posed frequently delve into sensitive or personal matters. Those subjects are often ones that a prospective juror might be reluctant to discuss candidly if compelled to do so in open court, but as to which candor is essential. At the same time, there may be

---

[9] Through our Administrative Determinations, effectuated by Administrative Directive #21-06, and revised thereafter by Administrative Directive #4-07, we embraced Jury Selection Standards, along with Model Jury Selection Questions, to be used in both criminal and civil trials. The trial in this matter predated the effective dates of both of those directives.

matters that evoke strong or harsh personal views that the parties are entitled to explore but that raise the specter of potential bias to which the others in the venire should not be exposed. In short, the process of selecting a fair, unbiased, and impartial jury in a trial such as the one in this matter can never be perfunctory or routine.

We do not expect jurors to come to our courtrooms without any life experiences, any more than we anticipate that only the ill-informed or reclusive members of society will be permitted to decide disputes. Instead, our jury selection mechanisms are designed to create the opportunity in which any relevant, precon-ceived notions will be revealed and explored, and all pre-existing biases will be exposed. In this way, we ensure that the court and the litigants have the information that they need to decide wheth-er a particular individual should not sit as a member of the panel.

Part and parcel of this process is deciding whether, as to some or all of the prospective jurors, questions should be posed, and responses elicited, in open court or at sidebar. This aspect of the trial court's role in jury selection requires great sensitivity to the issues in the dispute, the questions likely to be presented to the jury, the interests of the parties, and the legitimate privacy concerns of the members of our citizenry upon whom we call to serve as jurors. This function is even more important when the matter in dispute is itself a sensitive one, when it may, by its nature, engender strong feelings or emotional responses, or when the facts and circumstances that inevitably will be spread before the public on the record are intensely personal in nature. In those circumstances, the court must be mindful of the very real possibility that the individuals being screened for service on the jury themselves will have general or specific opinions reached in advance and perhaps reflective of deeply held views, which will interfere with their impartial service.

The court must be mindful that any lack of sensitivity in the voir dire process may result in the expression of a previously held belief or of a strong view based on a life experience that,

simply by its expression in open court, will affect the thinking of the others in the venire. In such a case, the very real risk remains that a remark might infect the thinking of others who hear it and that exercising challenges for cause or peremptorily will not suffice to cure the defect. This is particularly true if the fact or opinion expressed is stated with force or emotion, if it evokes sympathy, or if it casts blame on any of the parties, those they represent, or the trade or professional groups to which they belong. Although a stray, unanticipated remark or two may be cured by a cautionary admonition to those who overhear it, the impact of repeated expressions likely cannot be undone.

■ As our Appellate Division has commented, prospective jurors should be excluded from hearing

matters which might result in comments by [one] prospective juror which could have an adverse effect on the fairness of other prospective jurors (and, by implication, matters involving disclosure of sensitive information which the juror might wish to convey outside the hearing of the other jurors), [which] should be discussed at sidebar in the presence of "the judge and counsel privately on the record."

[*State v. Lomax*, 311 *N.J.Super.* 48, 52, 709 *A.2d* 277 (App.Div.1998) (quoting *State v. Kamienski*, 254 *N.J.Super.* 75, 109, 603 *A.2d* 78 (App.Div.), *certif. denied*, 130 *N.J.* 18, 611 *A.2d* 656 (1992) (emphasis omitted)).]

■ This trial, with its focus on significant injuries to a child, presented the trial court with precisely the sort of dispute in which heightened sensitivity in jury selection was necessary. The question before this Court is whether or not the trial court carried out that weighty responsibility appropriately.

The record reveals a stark contrast between the jury selection process that the trial court used in the first proceeding and the one employed after the mistrial was declared and that resulted in seating the jury that eventually deliberated. By comparing the two, and by considering the comments made by the trial court to justify the decision to change from the first method to the second, we can only conclude that the process used during the second trial represented a mistaken exercise of discretion.

In selecting the jury for the first trial, the court demonstrated the sort of careful procedure that the sensitive and emotionally-charged issues in the dispute required. For example, when a prospective juror stated that he was involved in a potential personal injury lawsuit, the court elected to continue the questioning at sidebar, where the juror revealed being involved in a suit against St. Barnabas. Similarly, when a prospective juror indicated that her brother had been sued recently for medical malpractice, the court continued the inquiry at sidebar, eventually dismissing that juror. The court also chose to conduct questioning at sidebar after learning that a prospective juror's son had been a recent patient in the ICU at St. Barnabas. In short, as those examples demonstrate, jurors who gave any hint about a view or a life experience that might have had the capacity to affect the others in the venire were questioned at sidebar and out of the hearing of the others. The examination was conducted with care and with an obvious appreciation that all of the parties were entitled to have the issues decided by a jury that was both fair and impartial.

After the first trial was well underway, when the trial court was advised about the hospital's discovery of the monitoring strips that had not been disclosed, the record reveals an extraordinary change in the proceedings. The court, explicitly blaming the hospital for withholding evidence, expressed an irritation that it characterized as being beyond words and explained in forceful terms its "outrage" at what had happened and at the party it blamed for the mistrial. In granting the motion for a mistrial, and in concluding that the hospital should bear the costs thereof, the court described that party as "at best careless, . . . [and having] a cavalier approach . . . to getting this case to trial." In a subsequent oral decision, the trial court referred to the hospital as demonstrating "at its best negligence" and as being "culpab[le]."

Although the second trial proceeded without the participation of the hospital as a party defendant, the events that caused the mistrial and the views expressed by the court at that time

continued to impact the proceedings thereafter. For example, in discussing the logistics of the mistrial and the impending second trial, the court commented that "this case is going to take a lot less time this time around."

The contrast between the voir dire process used in the first and the second trials is striking. Whether motivated by the expressed desire to be hasty or by lingering irritation about the mistrial, an apparent concern for expedience took the place of the care and sensitivity that the issues continued to demand. Rather than summoning potential jurors to sidebar for follow up on questions that should have alerted the court about potential bias, one after another they were allowed to voice deep feelings of resentment and bias in open court.

That a small number of individuals made comments that were adverse to plaintiffs cannot diminish the fact that the biased statements were directed overwhelmingly at hospitals, doctors, and health care professionals. The few comments that were generally negative toward plaintiffs were vastly outnumbered by those potential jurors who described the quality of care given at St. Barnabas as poor, who expressed anger and resentment at health care providers, and who were critical of doctors, nurses, and others in the hospital's employ.

Prospective jurors were permitted to describe a wide variety of negative experiences within the hearing of the venire, including all of the following. One potential juror's mother died while being treated for cancer at St. Barnabas, and he also expressed the view that the care his father received there was so improper that it required transfer to another hospital. Another potential juror said that his wife received poor care at St. Barnabas, leading to her transfer to Overlook Hospital. A third potential juror was "not at all" satisfied with the "quality of care at St. Barnabas with respect to [his] grandmother." Another potential juror spoke openly about a medical malpractice suit he brought against St. Barnabas and about a billing error that caused that potential juror such "bitterness" that he described the hospital as having "two

strikes against them". Still another commented that she was unsure whether the care her family received at St. Barnabas would influence her as juror.

In addition to all of those adverse comments about the hospital, there were numerous potential jurors who voiced complaints about the medical profession. One potential juror described the care given to his newborn child in another hospital's neonatal ICU as the "single worst moment of [his] life." Others expressed views about the poor treatment given to a parent suffering from leukemia; described disagreements with proposed exploratory surgery; revealed disputes over a doctor's alleged failure to provide information; and complained about a doctor's arrogance. There were expressions by potential jurors who were unhappy with hospital care; dissatisfied with a husband's hospital care; and a medical malpractice plaintiff who was "extremely bitter" about treatment received from an obstetrician. There were others who were dissatisfied in general with hospital treatment of terminally ill patients; unhappy with hospital care for a parent who had died; concededly incapable of putting aside prior disputes with anesthesiologists arising out of delivery complications; and unhappy with the result of a parent's leg amputation.

The trial court offered an explanation for the decision to alter the method of selection in response to defense counsel's application for the use of a sidebar during the second day of the selection process. At that time, the court justified the decision as follows:

This jury panel has seen life, and all its options and parameters and experiences ... The reason I have not gone to sidebar was to insure that the jury panel hears all of it because, for each part of it they hear, the less tainted they are. They know that that is one person's view. They know, for example, when a person says a doctor can do no wrong. That person leaves this jury. And with each person we excuse, it brings home more clearly to each of the jurors who are in this jury box, who said clearly and definitely that they can separate out personal experience and emotion from the facts and the testimony in the evidence, that reaffirms for them the importance of doing that.

The trial court offered a further explanation for its jury selection method when ruling on defendants' motion for a new trial or remittitur. In denying that motion and in rejecting the argument

that the jury selection process had tainted the entire panel, the trial court first reiterated its previously stated grounds. It then added another reason for its choice, explaining that permitting potential jurors to express their views, however biased, had served to "educate" the jury panel on the subject of bias and impartiality. In the trial court's opinion, allowing the venire to hear those views appropriately taught them about bias that they should avoid.

We assume that the trial court intended to impanel a jury that was both fair and impartial,[10] but the repeated expressions of anger, resentment, bitterness, and dissatisfaction, much of it directed at the very facility where the tragic events that were about to be considered had taken place, could not have been ignored by the jurors who overheard them. Moreover, when compared with the selection process used in the first trial, the explanations given by the trial court do not suffice. Permitting potential jurors to give vent to deep feelings of bias as an educational technique for those who do not already have such biases is simply inappropriate. Although an unexpected expression of bias by a juror may be unavoidable, intentionally exposing jurors to expressions of such bitterness, anger, resentment, and bias serves no legitimate purpose.

We do not share the Appellate Division's confidence that the jurors who ultimately decided the issues were not tainted by what they had heard. Nor is it relevant that the defense attorneys did not utilize all of their peremptory challenges. In light of the relentless and unchecked litany of complaints throughout the selection process, the attorneys had no way of knowing which of the potential jurors who had expressed no bias might later find it

---

[10] We are mindful of the fact that our recently revised jury voir dire procedures demand the use of open-ended questions. That tool is intended to give attorneys involved a better opportunity to hear and evaluate potential panel members for bias that would support a challenge for cause or, in the alternative, to assist them in using peremptory challenges. The open-ended questions, however, are relatively benign inquiries that will reveal useful information rather than questions that will compromise the objectivity of the others.

impossible to put aside what they had heard from those who had been excused. They therefore could not have utilized their peremptory challenges effectively to erase the taint, and the fact that they had challenges remaining does not suggest otherwise.

Were the criticisms of defendants and those similarly situated brief or sporadic, had they occurred without warning in the context of a procedure that was balanced toward an appropriate use of sidebar inquiries, we might find no taint. The record here, however, gives us no comfort and provides no ground on which to conclude that the jury was the fair and unbiased, impartial decision-maker that is fundamental to our system of justice.

Because we can have no confidence that the selection process resulted in a jury panel that could fairly and dispassionately evaluate the difficult and emotionally-charged issues that were central to this litigation, we cannot permit its verdict to stand.

## IV.

Although we could end our review of the issues raised by the parties with our conclusion that the tainted jury selection process entitles defendants to a new trial, we decline to do so. Instead, we take the opportunity to address briefly the numerous other claims that there were errors during the trial as a vehicle for offering guidance on the proper mechanism to be utilized in evaluating claims of cumulative error.

Because of the limited purpose that underlies our consideration of these additional claims of error, we need not include a complete recitation of the wide variety of matters that one or more of the several defendants believes constitutes error either individually or cumulatively. Nor need we evaluate these asserted errors independently in order to reach our conclusion about whether they rise to the level of cumulative error. Instead, by describing a few of the matters that defendants have made their focus, we can illustrate the appropriate analytical framework against which to test claims of this type.

For example, defendants assert that even though none of them had any role in the cutting, copying, or partial obliteration of the monitoring strips, plaintiffs' attorney was allowed to adopt a theme that implied that defendants had destroyed evidence, referring to the strips as the "single most honest piece of documentary evidence [that has] been lost to us." Similarly, Olesnicky, whose original expert report, based on a reconstruction of the timeline, was amended after it was undermined by the discovery of the monitoring strips, contends that the trial court unfairly permitted plaintiffs to argue that her attorney had "scripted" the new report and even allowed plaintiffs' counsel to do so by telling the jury about an entirely imaginary conversation to that effect. Anderson complains that when the hospital settled, the court allowed her only a week to retain a separate expert or to elect to rely on the hospital's expert, but that when she then opted to rely on the hospital's expert, the court decided that it would be a conflict of interest, as a result of which the nurses were unable to present any expert testimony regarding the standard of care and causation.

Defendants further assert that plaintiffs' counsel was permitted, over their objections, to engage in inflammatory and marginally relevant questioning of one of their experts relating to conditions at an infamous New York mental institution because he had worked there for a time and to argue that defendants hoped that the child would die prematurely, thereby reducing his life care costs, when the expert explained that individuals with similar injuries often have shortened life spans.

In some respects, defendants argue that the discretionary decisions were not applied in a fair and even-handed fashion as between plaintiffs and defendants. Anderson, for example, points out that when her attorney, in his closing argument, used the phrase "honest to God," the trial court admonished him sternly in an extensive sua sponte instruction to the jury about the impropriety of making such a reference. She argues that earlier in the trial, when plaintiffs' counsel invoked the deity by using the

phrase "God forbid, God forbid," the trial court had no similarly stinging rebuke, but responded to defendants' objection with a bland comment that counsel should "rephrase."

As a final example illustrating defendants' arguments, we note that they also point to two incidents to demonstrate this asserted lack of even-handed application of the discretionary calls. They first argue that the trial court precluded their expert from testifying about the cost of an annuity that would fully fund the life care plan, instead promising to explain the calculations to reduce an award to present value, a choice that the verdict demonstrates resulted in little adjustment in their favor. In contrast, they point out that the court permitted plaintiffs to introduce plainly inadmissible testimony about the emotional distress and suffering endured by plaintiff Areli Pellicer, the infant plaintiff's mother, in spite of the fact that she had no cognizable claim for such an award, *see Portee v. Jaffee*, 84 *N.J.* 88, 97–101, 417 *A.*2d 521 (1980) (limiting family member's cause of action for emotional distress); *Jablonowska v. Suther*, 195 *N.J.* 91, 95, 948 *A.*2d 610 (2008) (same), and refused their requests for a timely curative or limiting instruction. Defendants argue that the jury's $13 million award on that claim makes obvious the strong impact of that testimony and that the trial court's post-verdict decision to overturn it could not erase the effect on the jury of the repeated references to her distress and her loss.

The Appellate Division, in its decision, addressed the claims of error separately, concluding that none of them was of such significance to have deprived defendants of a fair trial. Notably, in the course of its decision, the appellate panel commented that no fewer than eight of the separate claimed errors [11] had some merit, commenting that the better practice, or the wiser course, or

---

[11] Technically, the Appellate Division also expressed similar reservations about the jury selection method. As with the other claims of error we address here, the panel concluded that the voir dire proceedings did not represent an abuse of the trial court's discretion. Because of our separate analysis of that claim, *see* Part III, *supra*, we need not address it here.

the more appropriate choice, would have been something other than what the trial court did.

In particular, the panel found fault with numerous aspects of plaintiffs' counsel's closing argument, including his comments: attributing an evil motive to defendants by suggesting that they wanted to benefit from the infant plaintiff's death; suggesting that proceeding to trial equated with defendants' bad faith; accusing Olesnicky's expert of "fabricat[ing] or contriv[ing]" his report, in particular through the presentation of fictitious conversations the panel described as "sarcastic"; and referring to the decision to administer Norcuron as "crazy". Nor were the Appellate Division's criticisms limited to the comments made by plaintiffs' counsel in summation; the panel also expressed its concern that the court's sua sponte admonition to the jury about the reference to the deity in Anderson's attorney's closing "might be viewed as an overreaction."

Although agreeing with defendants that each of those comments or events was inappropriate, and although expressing reservations about each of them, the panel concluded that, to the extent that any of them could be characterized as an error, each was harmless. As for defendants' assertions that the cumulative effect of the claimed errors deprived them of a fair trial, the panel rejected that analysis with a single sentence.

Only occasionally have we considered the meaning of cumulative error and only rarely have we addressed what aggregation of errors will suffice to overturn a verdict. We have never implied, and we do not now conclude, that the simple addition of small and otherwise inconsequential mistakes will amount to cumulative error that supports relief, lest our trial and appellate judges become consumed with counting and quantifying rather than evaluating and qualitatively analyzing. It is in that vein that we consider how to articulate an appropriate test for application in this and future cases.

We begin with the observation that the cumulative error test most often arises in the context of an appeal as to which the

aggrieved party has sought, and been denied, a new trial. As such, it is informed by the dictates of *Rule* 4:49–1(a), which provides that the motion is governed by the miscarriage of justice standard and evaluated in accordance with a heavy burden, that the appearance of injustice be clear and convincing. *Ibid.*; *see Caldwell v. Haynes*, 136 *N.J.* 422, 432, 643 *A.*2d 564 (1994). In like manner, an appellate court looks to the "miscarriage of justice" standard in reviewing a trial court's denial of a new trial motion. *See R.* 2:10–1.

Although those standards are helpful, they merely form the basis for our review of the decisions in which we have considered claims of cumulative error. We first discussed the concept of cumulative error in the context of a criminal trial. *See State v. Orecchio*, 16 *N.J.* 125, 106 *A.*2d 541 (1954). We there affirmed the appellate court's reversal of a conviction and grant of a new trial on cumulative error grounds, commenting that the charged atmosphere surrounding allegations of gambling among law enforcement officers had infected the trial and interfered with a fair verdict. In reaching our conclusions, we commented on the limitations of a cumulative error analysis:

> This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial, and in recent days this court has not hesitated to deny such relief to the defendant.... Where, however, the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury.
>
> [*Id.* at 129, 106 *A.*2d 541 (internal citations omitted).]

We specifically cautioned that where there is sufficient doubt about the fairness of the proceedings, we cannot simply close our eyes and let the guilty verdict stand on the assumption that the defendant is probably guilty. *Id.* at 129–30, 106 *A.*2d 541. Instead, we recognized that such an approach would be, in essence, an erroneous substitution of the court's view for that of the jury. *Ibid.* (quoting *Weiler v. United States*, 323 *U.S.* 606, 611, 65 *S.Ct.* 548, 551, 89 *L.Ed.* 495, 499 (1945)).

We extended our cumulative error analysis to the civil realm thereafter, reversing a verdict for plaintiffs injured in an automobile accident. *See Biruk v. Wilson*, 50 *N.J.* 253, 263, 234 *A.*2d 225 (1967). In doing so, we identified several comments made by counsel that were inappropriate, noting in particular a wholly unsupported and misleading suggestion that there was a witness who had not testified but who might have had helpful information and an equally baseless suggestion that the defendant had caused the accident by engaging in a game or by racing with another vehicle. *Id.* at 261, 234 *A.*2d 225. Although we described those comments as baseless and unwarranted, and we expressed our disapproval of such trial tactics, *ibid.*, we did not reverse the verdict solely on that ground, noting that there were also errors in the jury instructions that had the capacity to mislead the jury, *id.* at 261–62, 234 *A.*2d 225. In evaluating the cumulative error claim, we commented that, when taken individually, each of those points would not seem to be of great significance and that none separately would warrant a reversal. *Id.* at 262, 234 *A.*2d 225. However, in part because the case was a "very close one" and the evidence of liability was "extremely thin," *id.* at 263, 234 *A.*2d 225, we were persuaded that the errors might have tipped the balance unfairly, warranting a new trial, *ibid.*

Relevant to our consideration of the issues raised in this appeal, we have recognized that the cumulative effect of small errors may be so great as to work prejudice, and we have not hesitated to afford the party suffering that prejudice relief where it has been warranted. *Ibid.*; *see Schueler v. Strelinger*, 43 *N.J.* 330, 338–50, 204 *A.*2d 577 (1964) (finding that cumulative error warranted reversal where there was no competent evidence that defendant deviated from accepted standard of care, trial court asked improper questions during voir dire, and plaintiffs' attorney persisted in improper cross-examination of defense witness); *State v. West*, 29 *N.J.* 327, 335–39, 149 *A.*2d 217 (1959) (reversing guilty verdict based on "a number of prejudicial errors which in their aggregate permit no other course," including incompetent and prejudicial testimonial proof and prosecutor's improper cross-examination of

defendant); *Orecchio, supra,* 16 *N.J.* at 129–42, 106 *A.*2d 541 (finding that evidentiary errors without proper limiting instructions, admission of improper hearsay testimony, and inflammatory prosecutorial comments, in the aggregate, were "of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, [and therefore] our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury").

The Appellate Division has likewise recognized the capacity of many otherwise small errors to create the likelihood of an unjust result and has acted to correct that injustice by affording aggrieved parties new trials based on an evaluation of cumulative error. *See, e.g., Hofstrom v. Share,* 295 *N.J.Super.* 186, 193, 684 *A.*2d 981 (App.Div.1996) (noting that appellate courts often have afforded relief when counsel persists in making unwarranted, prejudicial appeals to jury, leading to tainted verdict), *certif. denied,* 148 *N.J.* 462, 690 *A.*2d 610 (1997); *Eden v. Conrail,* 175 *N.J.Super.* 263, 267, 418 *A.*2d 278 (App.Div.1980) ("we are satisfied that legal errors are manifest that might individually not be of such magnitude to require reversal but which, considered in their aggregate, have caused plaintiff to receive less than a fair trial"), *aff'd,* 87 *N.J.* 467, 435 *A.*2d 556 (1981); *State v. Mack,* 86 *N.J.Super.* 594, 597, 207 *A.*2d 567 (App.Div.1965) (finding cumulative effect of combined trial errors "to be substantial and vital and to have possessed a clear capacity to bring about an unjust result, and that fundamental fairness requires a reversal of the conviction"); *Wimberly v. City of Paterson,* 75 *N.J.Super.* 584, 612, 183 *A.*2d 691 (App.Div.) (finding that trial errors, "[t]aken in their aggregate ... rendered the trial so unfair as to require a reversal"), *certif. denied,* 38 *N.J.* 340, 184 *A.*2d 652 (1962).

As our Appellate Division has aptly observed, "a trial is a dynamic organism which can be desensitized by too much error or too much curative instruction." *Diakamopoulos v. Monmouth Med. Ctr.,* 312 *N.J.Super.* 20, 37, 711 *A.*2d 321 (App.Div.1998). In the appropriate circumstances, therefore, a new trial may be

warranted when "there were too many errors [and] the errors relate to relevant matters and in the aggregate rendered the trial unfair." *Ibid.*

We do not intend to suggest that evaluating claims of cumulative error simply entails counting mistakes, because even a large number of errors, if inconsequential, may not operate to create an injustice. Nor do we intend to imply that counsel can create a cumulative error argument by repeating a single objection over and over in the hope that merely by adding together the erroneous rulings the court will be persuaded that there has been an unjust result. That is, we do not invite, nor will we countenance, appeals that do no more than point to minutiae in an effort to create the impression that there was an atmosphere of unfairness.

Nonetheless, because we have recognized that some errors may well cumulate to create just such an effect, we take the opportunity to consider how we will evaluate such claims. The record before us provides an appropriate vehicle for us to explain the contours of the theory, in part because it bespeaks cumulative error. Indeed, throughout its decision, the appellate panel repeatedly criticized the rulings and the procedures about which defendants complained, commenting that the wiser choice or the better practice would have been different from the one chosen by the trial court, or pointing out that the trial court should have followed a course different from the one selected. Although the panel eventually rejected the cumulative error argument without separately analyzing it, our review compels us to disagree with that decision.

Our conclusion that there was cumulative error in this record is based on several factors. First, our review of the matters as to which the trial court erred demonstrates that they pervaded the trial. Second, many of the troubling discretionary decisions permitted plaintiffs to shift the jury's focus from a fair evaluation of the evidence to pursue instead a course designed to inflame the jury, appealing repeatedly to inappropriate and irrele-

vant considerations that had no place in the courtroom. Third, the treatment of the parties was not even-handed, with defendants, but not plaintiffs, being limited in their proofs or criticized for their words. Finally, a review of the complete record, including the jury selection method and the quantum of the verdict, engenders the distinct impression that defendants were not accorded justice.

A recitation of the matters that undergird our conclusion will illustrate these aspects of our analysis. Although the appellate panel seemed most troubled by the numerous inappropriate assertions, accusations, and insinuations in plaintiffs' counsel's closing argument, our evaluation is not so limited. The court's conceded outrage about the events that led to the declaration of the mistrial translated into an uneven exercise of discretion all to the detriment of defendants, in spite of the fact that they had not played any role in the events that caused the mistrial. That is, the limits imposed on defendants, but not plaintiffs, relating to their use of experts and proofs, in particular, the court's exclusion of proffered expert evidence about the cost of an annuity that would fully fund the life care plan; the failure to intercede to stop the insinuations that these defendants, rather than the hospital, had lost or destroyed evidence; the refusal to address the disparagement of the expert's national origin, education, and experience; the admission of wholly irrelevant evidence relating to the adult plaintiff's emotional distress; the sua sponte criticism of defendants' but not plaintiffs' counsel's common parlance reference to the deity; and the rejection of appropriate limiting or curative instructions and jury charges, taken together, satisfy the test for cumulative error and call for relief.

Our review of the record convinces us that, taken together, these numerous claims of error cannot be explained away as harmless. They are not simply a litany of minor or inconsequential matters of no substance or significance. Rather, they represent real and repeated errors that cumulated so as to unfairly tilt

the balance in favor of plaintiffs and to deprive defendants of a fair trial.

## V.

Finally, we add a few brief comments directed to defendants' arguments that the $71 million total verdict, and in particular, the $50 million verdict for the infant plaintiff's pain and suffering, is excessive. Defendants moved, without success, for a new trial or for remittitur, arguing that the verdict's size was so shocking and disproportionate in comparison to the evidence of the injuries that it cannot stand.

Defendants contend that the verdict is excessive as compared to any other, pointing out that the only similar award, one widely reported in the popular press, was later reversed on appeal because that jury had been permitted to consider testimony that was both inadmissible and inflammatory. *See Verni v. Harry M. Stevens, Inc.*, 387 *N.J.Super.* 160, 215, 903 *A.2d* 475 (App.Div. 2006), *certif. denied,* 189 *N.J.* 429, 915 *A.2d* 1052 (2007). They assert that this trial likewise was flawed, such that the jury's proper role was displaced by an inappropriate punitive animus. Their excessive verdict arguments are supported by all three amici [12] as well.

We need say little about the faith we place in juries and our confidence in their ability to play their role in equating damages with dollars beyond reiterating that the responsibility they have of "[a]ssigning a monetary value to pain-and-suffering compensation is difficult because that kind of harm is 'not gauged by any established graduated scale.'" *Caldwell, supra,* 136 *N.J.* at 422, 643 *A.2d* 564 (quoting *Cermak v. Hertz Corp.*, 53 *N.J.Super.* 455,

---

[12] In summary, the amici raise alarms about the verdict's feared adverse impact on our state's health care system and about escalating malpractice insurance premiums. In large measure, however, their concerns relate to larger questions about tort reform and, as such, are directed more appropriately to the Legislature than to this Court.

465, 147 *A.*2d 800 (App.Div.1958), *aff'd,* 28 *N.J.* 568, 147 *A.*2d 795 (1959)); *see Johnson v. Scaccetti,* 192 *N.J.* 256, 279–80, 927 *A.*2d 1269 (2007) (noting that such damages "are not susceptible to scientific precision ... because there is no neat formula for translating pain and suffering into monetary compensation").

Nor need we reiterate the familiar principles governing excessive verdicts and the use of remittitur as an alternative to the grant of a new trial on damages. *Fertile v. St. Michael's Med. Ctr.,* 169 *N.J.* 481, 490–92, 779 *A.*2d 1078 (2001) (explaining function of remittitur is "to bring excessive damages awarded by a jury to the level that the court knows is within the limits of a proper verdict and thereby avoid the necessity of a new trial"); *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 596, 379 *A.*2d 225 (1977) (noting role of remittitur is to reduce damage award that "is so disproportionate ... as to shock [the court's] conscience and to convince [the court] that to sustain the award would be manifestly unjust").

Ordinarily we rely on trial courts and their firsthand "feel of the case" as it bears on an analysis of whether the jury's verdict was motivated by improper influences. *Baxter, supra,* 74 *N.J.* at 600, 379 *A.*2d 225 (acknowledging trial court's "feel of the case" is advantageous as compared with appellate court's dependence on cold record); *see Fritsche v. Westinghouse Elec. Corp.,* 55 *N.J.* 322, 330, 261 *A.*2d 657 (1970) ("[a]n appellate court ... lacks the opportunity to observe and hear the witnesses who appear before the trial judge and jury"); *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969) (noting trial court's ability to take account of "intangible 'feel of the case' ... gained by presiding over the trial"). However, when the magnitude of the verdict is "historic" or enormous, a careful and searching review by an appellate court is essential to ensure that the parties have been treated justly and that the trial court's view of the verdict is not itself obscured by compassion or sympathy.

In evaluating this aspect of the verdict, we note that it far exceeded even plaintiffs' counsel's time-unit argument, with its

"thirty-nine-million minutes" appeal. We observe as well that there was a vigorous debate, albeit constrained by some of the evidentiary rulings, about two issues that ordinarily inform such an award. That is, there were significant disputes both about the child's likely projected, as opposed to statistical, life expectancy and about his cognitive appreciation for his limitations as it would bear on his suffering.

Standing alone, if that verdict had been awarded by a fairly impaneled, dispassionate, and unbiased jury, based on adequate and appropriate testimony and evidence, the award might well be sustainable. In the end, however, our concerns about the improprieties that infected this trial call the verdict into question because this historic and extraordinary damage award cannot be separated from those errors. *See Fertile, supra,* 169 *N.J.* at 499, 779 *A.*2d 1078 (holding that, rather than remittitur, "[t]o justify a new trial on all issues, what is required is trial error ... or some other indicia of bias, passion or prejudice, impacting on the liability verdict").

## VI.

For all of the foregoing reasons, we reverse the verdict, both as to liability for all of the defendants and as to damages, and we remand this matter for a new trial. In doing so, we reinstate the claims against defendant Rue because a fair presentation of the evidence by plaintiffs must include their claims against all defendants, including her. Further, because it unfortunately appears that the trial court's admitted outrage at the hospital was not dissipated by that party's settlement and sanction, out of an abundance of caution and to ensure fairness to all of the parties, we direct that on remand the matter be assigned to a different trial judge. *See, e.g., Entress v. Entress,* 376 *N.J.Super.* 125, 133, 869 *A.*2d 451 (App.Div.2005) (remanding to different judge "to avoid the appearance of bias or prejudice based upon the judge's prior involvement ... and his expressions of frustration"); *Luedtke v. Shobert,* 342 *N.J.Super.* 202, 219, 776 *A.*2d 233 (App.

Div.2001) (recognizing "time and effort the court put into the case" but expressing concern that judge would be in "untenable position" on remand); *Carmichael v. Bryan,* 310 *N.J.Super.* 34, 49, 707 *A.*2d 1357 (App.Div.1998) (noting that judge's expressions of opinion might evidence "commitment to his findings").

## VII.

The judgment of the Appellate Division is reversed, the verdict is vacated, and the matter is remanded for a new trial.

*For reversal/vacation/remandment*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—6.

*Opposed*—None.