# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1686-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.M.,

     Defendant-Appellant.

_____

Submitted October 31, 2019 – Decided April 28, 2020

Before Judges Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-06-0776.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Deputy Public Defender II, of counsel and on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Defendant, P.M.[1], appeals from a judgment of conviction entered after a jury found him guilty of committing twelve sex-related crimes against his stepdaughter, and a judge sentenced him to an aggregate twenty-eight-year prison term and ordered him to make certain payments, including a $1000 Sex Crime Victim Treatment Fund (SCVTF) penalty. He argues the following points:

> Point I:
>
> DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE CUMULATIVE IMPACT OF THREE ERRORS: 1) IMPROPER OPINION RENDERED BY THE STATE'S EXPERT WITNESS; 2) UNFAIR ARGUMENT IN THE STATE'S SUMMATION; AND 3) OVERLY-DETAILED "FRESH COMPLAINT" TESTIMONY.
>
> Point II:
>
> IF DEFENDANT'S CONVICTIONS ARE NOT REVERSED, THE MATTER MUST BE REMANDED FOR RESENTENCING DUE TO NUMEROUS ERRORS IN THE SENTENCE.

We find the alleged trial errors were harmless, but the matter must be remanded for two aspects of the sentence: the trial court's explanation for

---

[1] We use initials and pseudonyms to maintain the confidentiality of the parties.

A-1686-17T3

ordering less restrictive sentences to be served before more restrictive sentences, and an ability-to-pay hearing concerning the SCVTF penalty.

## I.

## A.

A Bergen County grand jury charged defendant in a 2016 indictment with two counts of third-degree aggravated criminal sexual contact (counts one and two), N.J.S.A. 2C:14-3(a), four counts of fourth-degree criminal sexual contact (counts three through six), N.J.S.A. 2C:14-3(b), fourth-degree attempted criminal sexual contact (count seven), N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-3(b), second-degree sexual assault (count eight), N.J.S.A. 2C:14-2(c)(1), third-degree criminal coercion (count nine), N.J.S.A. 2C:13-5, two counts of second-degree endangering the welfare of a child (counts ten and eleven), N.J.S.A. 2C:24-4(a), and third-degree endangering the welfare of a child by possessing an exploitive photograph (count twelve), N.J.S.A. 2C:24-4(b)(5)(b).

The trial court granted the State's pre-trial motion for leave to introduce fresh complaint testimony from several witnesses. A jury convicted defendant on all counts, and the trial court denied defendant's motion for a new trial.

During defendant's sentencing proceeding, the court merged one child endangerment count (eleven) into the other (ten). The court imposed concurrent

four-year prison terms on counts one and two, third-degree aggravated criminal sexual contact; concurrent one-year prison terms on counts three through six, fourth-degree criminal sexual contact; and a concurrent one-year prison term on count seven, fourth-degree attempted criminal sexual contact.

The court imposed consecutive prison terms on the remaining counts, consecutive to each other and to the counts for which the court had imposed concurrent terms. The court imposed an eight-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count eight, second-degree sexual assault; a four-year prison term on count nine, third-degree criminal coercion; an eight-year prison term on count ten, second-degree endangering a child's welfare; and a four-year prison term on count twelve, third-degree endangering a child's welfare by possessing an exploitive photograph.

Altogether, the court sentenced defendant to serve twenty-eight years in prison, eight subject to NERA. The court also imposed numerous fines, penalties, and assessments; ordered defendant to comply with Megan's Law's registration requirement, N.J.S.A. 2C:7-2; and ordered that an existing sex offender restraining order remain in place. This appeal followed.

B.

A-1686-17T3

At trial, defendant's stepdaughter, whom we will refer to by the pseudonym Amy, described in detail how defendant sexually abused her during her first three years of high school. She testified that she and her mother met defendant the summer before she started seventh grade, and her mother and defendant later married. Defendant remained with the family until authorities arrested him during Amy's junior year of high school. A paternal figure in Amy's eyes at first, defendant's molestation of Amy began with groping outside her clothes, escalated to more intense and sustained groping inside her clothes, and culminated with Amy's disclosure to authorities after incidents of near or actual digital penetration.

Six months after moving into a River Edge apartment, defendant, Amy's mother, Amy, and her brother moved into a house in River Edge, where they lived until 2015, Amy's sophomore year of high school. From there the family moved to a residence in New Milford.[2] The abuse began in the River Edge house.

Amy's relationship with her mother had been poor. Amy feared her mother, who had abused Amy, verbally, emotionally, and physically, sometimes

---

[2] During the trial, Amy testified she moved into the New Milford residence in 2016. That appears to have been a mistake, as much of defendant's abuse of Amy occurred there, and defendant was arrested in November 2015.

A-1686-17T3

hitting her, sometimes dragging her around the house by her hair. Their relationship improved during the first year of her mother's marriage to defendant. According to Amy, her mother seemed happy, which made Amy feel good. After a year of marriage, however, her mother reverted. She and defendant began to argue, and Amy's mother took her anger out on Amy. When that began to happen, defendant became nicer to Amy and protective of her.

Amy was really happy that she had a father figure who was exceptionally nice to her, respectful, and protective. That too changed. When Amy started high school, defendant "started getting a little hands on." Amy explained that defendant was at first "very sly about it[,]" grabbing and slapping her buttocks over her clothes when she was alone with him. She told defendant this made her uncomfortable, but he said it "really didn't mean anything to him." He would get defensive and say "that's how I show my love," but he did not stop. Instead, "things really started to take a nasty turn" with what Amy described as the "video incident" involving her and her former boyfriend.

Amy said she met her former boyfriend—former at the time of trial—in eighth grade and continued to have strong feelings for him when she started high school. They would "chat" through "KiK," a text messaging phone application. When Amy was a fifteen-year-old high school sophomore, she and her former

A-1686-17T3

boyfriend made plans through face-to-face conversations and KiK chats to have sex one day after school at Amy's River Edge residence. Defendant, who monitored Amy's cellular phone, learned of the planned meeting. Purportedly to be a cool parent, he encouraged her to go through with it, assuring her no one would be home. Amy was pleased, because she knew her mother would "probably kill [her]" if she knew.

The next day, when Amy arrived at her home after school, she phoned her former boyfriend, who said he could not come over. They decided to become intimate through texts and photos they could transmit over their cellular phones. After checking to see no one was home, Amy went to her room, undressed, and began to engage in acts of self-stimulation, as did her former boyfriend. During the episode, they transmitted four messages and four photos, the latter depicting Amy's breasts and her former boyfriend's penis. Amy transmitted the messages and photos on her Apple phone. The date stamp on the messages was February 12, 2015. Amy was sixteen years old. The episode ended when defendant emerged from Amy's bedroom closet.

Amy testified defendant emerged holding his cellular phone as if he were recording. He told her he was recording her. He sat on the side of the bed and told her "to finish in front of him." She refused, saying she would rather get in

trouble with her mother. She began to cry and attempted to cover herself with her hands and the covers. Using his phone—which according to Amy was not an Apple phone—defendant took screen shots of the text messages and photos on Amy's phone. He made fun of her but said he would not tell her mother. He told her not to delete the messages from her phone and that he was going to save the photos and put them in a safe "to use . . . whenever he wanted or whenever it was convenient to him." He threw Amy's clothes at her and told her to get dressed.

After dressing, Amy went downstairs. Defendant told her "he was going to keep this dirty little secret" from her mother and then he grabbed Amy and kissed her on the mouth. He said he loved her, then told her to go pick up her brother from school.

Amy explained to the jury this incident not only crushed her confidence, but also allowed defendant "to do whatever he wanted" because she could not speak up given what he had. His sexual abuse of her intensified. He would grab her breasts and buttocks often, over and under her clothes. He would come into the bathroom while she showered, open the curtains, and strike up a conversation. He would enter her bedroom and watch her undress. He said he loved and cared for her and that is how he showed his love. Amy testified she

eventually gave up and just "started letting it happen" because it made no difference.

In March of Amy's sophomore year of high school, the family moved to the New Milford residence. Amy testified that between the move and defendant's November 2015 arrest, in addition to his ongoing groping, there were five incidents when his abuse became more aggressive. The first incident occurred one day when he told her to go to his bedroom. She initially refused, but he reminded her he still had "those things," referring to the photos and the video she thought he took. Amy relented. Defendant sat down on his bed with his legs spread, pulled Amy close, groped her breasts over and under her clothes, and rubbed her vagina over her jeans. Next, he bent her over the bed, stripped to his underwear, and thrust himself against Amy's buttocks. She felt his penis become erect beneath his underwear. Amy would not let defendant remove her clothes. She ran out of the bedroom, locked herself in the bathroom, and began dry heaving.

The second incident occurred the next day. Defendant brought home travel size liquor bottles, took a few sips, and gave the rest to her to drink. She "became a little bit intoxicated." Defendant led Amy up to his bedroom, sat on the bed with his legs spread, brought her backward between his legs, and began

9

kissing her back and neck. He touched her breasts over and under her clothes, and in a "heavy handed" manner he tried to stimulate her over her pants. Amy slapped defendant's hands away when he tried to put them in her pants. Defendant attempted to get Amy to touch his penis with her hand. Impaired by the alcohol she had consumed, Amy began to feel sick. She also felt gross and angry. She went to the bathroom and threw up.

Amy testified that things "became very tense" after this incident because defendant had "never been so direct." Three more incidents took place, two in her bed. The first occurred one morning when Amy woke up and found her underwear down around her ankles. She had no recollection of how this happened, and she was scared. Amy confronted defendant, and he "brushed it off and that was it." The second occurred one morning at approximately five o'clock. Defendant entered her bedroom, knelt beside Amy's bed, and began touching her leg, sliding his hand toward her vagina. Not wanting to wake her mother, who was in a room across the hall, or her brother, who was sleeping in the same room as Amy, Amy pretended to be in a deep sleep. Defendant, who was breathing heavy and grunting, put his hand under the covers, between Amy's legs, and put his fingers between her "vaginal lips." Amy closed her legs "like a vice grip" and defendant got frustrated and left her room.

A-1686-17T3

Amy could no longer keep the abuse to herself. That afternoon she told her current boyfriend about the ongoing abuse. She also telephoned defendant and told him she was awake that morning. Defendant became silent, then denied the accusation, called her a liar, and said she did not know it was him.

During the fifth and final incident, defendant told Amy to follow him downstairs to the kitchen in the dark. Once there, defendant turned Amy around so her back was facing him, hugged and kissed her, and put his hand under her shirt and bra. Amy pushed defendant off her, yelled she had had enough, and said she intended to tell someone about his abuse. Defendant told her to go to bed.

The next day, defendant told Amy's mother to make sure Amy called him after school. Amy did. She testified she told defendant she had had enough and intended to disclose his abuse. He yelled at her, told her she was ungrateful, and said no one would believe her because she did not have enough evidence. Amy testified she continued going to school for approximately another week before breaking down in her first period class on November 25, 2015, and running to the nurse's office.

Amy told the nurse, "[m]y stepdad has been molesting me for the past three years." The nurse brought in the guidance counselor. Before the day

11

ended, Amy disclosed the abuse to the guidance counselor, the school resource officer, and a New Milford Police Officer, who notified the prosecutor's office. Detective Dennis Conway, a detective employed by the Bergen County Prosecutor's Office in the Special Victims Unit, interviewed Amy. That night, law enforcement officers arrested defendant. Detective Conway obtained a search warrant and the officers who executed it the next day seized three cellular phones, one tablet, and one laptop computer from defendant's vehicle. Defendant stipulated that two of the phones, the laptop, and the tablet were his.

The State presented the testimony of two forensic experts who extracted and analyzed data from defendant's cellular telephones and laptop. They found nothing evidential on the cellular phones. On the laptop, they found the eight images of the text messages and photo Amy had exchanged with her former boyfriend during the video incident. Fairly construed, the forensic testimony demonstrated defendant had used one of his cellular phones to photograph the images on Amy's phone and then downloaded the images from his cellular phone to his computer. One expert testified the cellular phone used to take the screen images of the eight text messages and photographs was the same cellular phone used to take a "selfie" picture of defendant. The text messages and photos on

12

Amy's phone were "captured" on defendant's phone on March 5, 2015, at 12:42:55 a.m.

One of the experts, Matthew Nathanson, testified he could extract no data from defendant's tablet because it was encrypted. The following exchange took place between Nathanson and the prosecutor:

> Q      Why were you not able to do that with the Microsoft Surface tablet?
>
> A      This particular one had a full disk encryption.
>
> Q      Okay. Can you explain to us what encryption is?
>
> A      Encryption is a way of -- of locking data on a[n] electronic device. A simple way of putting it, on your iPhone if you have a six digit code you -- you're entering that code, that's a decryption key. If your phone's locked, that's -- it's encrypted at that state.
>
> Q      Is encryption the same as, let's say, having a password for your user name on Windows though?
>
> A      No. Full disk encryption is -- is completely different than that. Where –
>
> Q      Explain it for us, you said full disk encryption, correct?
>
> A      Yeah, correct.
>
> Q      Explain that concept for us, please.
>
> A      Full -- full disk encryption essentially locks down every file on that device, and unless you have a

A-1686-17T3

decryption key to unlock it, you're not able to see the contents of it or create an image of it to – to analyze.

Q    Is full disk encryption something that automatically can happen on a computer or must it be user initiated?

A    It's usually user initiated, right, like you wouldn't get -- you wouldn't buy a device that was completely locked down and you wouldn't have a key to unlock it.  It would -- it would essentially be useless, so it's something that you -- you would have to do, and you would have to save, and store, and remember that password because if you don't have the decryption key, you won't be able to use that device.

Q    In -- in your training and experience as a forensic analyst in a number of roles, how common is full disk encryption for you to come across?

A    Uncommon.  I don't -- at my time at the prosecutor's office I only saw it a handful of times[.]

Q    And in what context in the few times that you saw it did you actually see it?

A    The -- the times I saw it were child pornography cases.

The prosecutor completed his direct examination of Nathanson with the last question and answer.  The court took a short recess.  When the trial resumed, defendant moved for a mistrial based on the expert's reference to encrypted child pornography.  The court denied the motion, but gave the following curative instruction, to which the prosecutor and defendant agreed:

14

THE COURT: Ladies and gentlemen, we're about to hear cross-examination of Mr. Nathanson.

You may recall testimony from Mr. Nathanson that in his training and experience he has encountered full disk encryption in the context of child pornography. There was no testimony that items of that nature, or otherwise, were recovered from the Microsoft Surface tablet. You may not infer from that testimony, in and of itself, the digital contents of that Microsoft Surface tablet contained child pornography.

Amy's former boyfriend testified. He confirmed her testimony about their relationship from middle school through their sophomore year of high school, and he authenticated the eight images of his and Amy's message and photo exchanges during the video incident.

The State also presented three witnesses to establish "fresh complaints": her current boyfriend at the time of the disclosure, the high school nurse, and the high school guidance counselor. In response to the school nurse's notification that Amy was in her office and extremely upset, the guidance counselor went to the nurse's office. The prosecutor questioned her about what happened next and the following exchange occurred:

A    The nurse's office is here. And, there's a chair sitting next to her. And there is this very pretty girl what I could tell with very long hair sitting in a chair with her legs to her chest and she was hysterically crying. And, I walked in. And, I didn't know who the girl was. And I just said, "What's the matter pretty

15

girl?" Because I wasn't sure what was going on. She looked up at me, she was breathing very heavily, crying and [the nurse] said, "This is [Amy]" And that was my first clinical introduction to [Amy.]

Q     What happened next?

A     [The nurse] informed me that [Amy] came to her and was discussing things that were going on in her life that she was very, very unhappy about. And that [the nurse] thought that it fell out of the scope of what her position was. So, she asked me to meet with her.

Q     Did you meet with her?

A     Yes. I took [Amy] into the back room of the health office because I couldn't meet with [Amy] with [the nurse] outside because the students were coming in and out. I brought her into our back office of the health room and I kept the door open. And, [Amy] was very upset. She was breathing very heavily. I couldn't really even understand what she was saying. So, we did some deep breathing relaxations to try to get her to calm her breathing down so I could understand. So, I said to her, "Honey what can I help you with?" It was during that time that she said to me that she's very unhappy about what things are going on in her life. And, I still really wasn't sure what was going on. It could've been a boyfriend break up. It could have been something -- I'm like, "Well, what's going on in your life?" So, she's rocking in her chair, and she's playing with her hair. And, she said that she was being abused. And, I said, "What do you mean you're being abused." And she said that her stepfather was sexually molesting her.

Q     Okay. . . . [How] was she sitting at the time that you're talking to her at this point?

A    She -- I'm sitting at the end of the table here. And, she's sitting here. And she has her head down and she's rocking back and forth when she's speaking to me. She still – she still is crying but she has calmed down enough for me to understand what was being said.

Q    Okay.

A    She was basically trying to -- soothe herself through the rocking.

Q    Okay. Just generally, if you could tell the jury [what she] said?

A    Basically what happens is that in a school setting when a student starts talking about abuse we have to get as much information as we can to take the next step. There's so many things that fall outside the scope of a school that we can't handle that we have to bring it onto the police or -- or to someone else who has expertise in the field. So, when I asked her what was going on she said to me that her step father who she identified as [P.M.] was rubbing her breasts . . . .

Defendant objected and the attorneys proceeded to sidebar. For unknown reasons, the sidebar discussion was not recorded. Following the sidebar conference, the prosecutor asked the guidance counselor, "could you please tell the jury what [Amy] told you just very generally about what happened or what she said happened?" The witness responded that "her breasts were rubbed, her buttocks was rubbed, she would wake up in the morning and her . . . ."

Defendant presented no witnesses. His defense was Amy had concocted

her entire testimony. He crafted his defense theory around his cross-examination of the State's witnesses and several inconsistencies in the State's case, and he presented his defense through his attorney's summation, the central theme being Amy lied.

The day before Amy disclosed the abuse to the school nurse and guidance counselor, she had an argument with defendant and her mother. They wanted her to become more involved in Civil Air Patrol, to excel, and to make it a priority. Defendant said she was unmotivated and needed to push herself. They cared little about what she wanted, they wanted her to focus on Civil Air Patrol. Although Amy testified the argument had "absolutely nothing" to do with her subsequent disclosure, defense counsel suggested the argument and its timing were Amy's motivation for concocting her story.

Defendant did not deny in summation that he used his cellular phone to capture the eight screen shots on Amy's cellular phone. Rather, he pointed out, as Amy had testified, that he periodically checked her cell phone as a condition of its use. He did deny taking the screen shots after emerging from the closet in Amy's bedroom. He noted that though Amy claimed the incident took place on a February afternoon after school, between three and four o'clock, the State's forensic expert showed defendant had taken the photographs after midnight in

18

March 2015, "a completely different day," and in fact nearly a month after the day Amy said the incident occurred. Defendant also pointed out he did not download the photographs to his computer until nearly three months later, in June 2015.

Defendant emphasized that if Amy lied about the video incident—as evidenced by the State's expert testimony about the date of the screen shots defendant took—the jury could conclude she lied about everything else. He added that Amy's reference to the events occurring in 2016 rather than in 2015 was more evidence that she had lied.

Early in her summation, the prosecutor told the jury:

> Before we go further I want to talk to you a little bit about where evidence comes from. The State doesn't create evidence, generally. We gather the existing evidence. [P.M.], the defendant, he's the one that chose the crime scene. He chose where he was going to molest [Amy]. And just like other cases we have in the Special Victims Unit, when a perpetrator molests a child, anyone under the age of 18, and it's an interfamilial situation, there is shame and guilt and a delayed disclosure, just like in this case. And a defendant doesn't get to commit a crime against a child in secret and then later on claim that he gets to get away with it because we don't have all that great evidence that they have in the CSI shows and homicide cases. No physical evidence, no eyewitness testimony, no surveillance tapes or fingerprints or DNA.

19

To refute defendant's argument about when defendant took the screen shots of Amy's phone, the prosecutor noted defendant had told Amy not to erase the explicit messages and photos from her cellular phone. The prosecutor suggested defendant photographed them with his phone again in March 2015, to eventually load them onto his computer in June 2015.

The trial court included the following instruction in its charge to the jury:

> Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence.
>
> Although the attorneys may point out what they think [is] important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial.
>
> Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to determine based on all the evidence presented during the trial. Any comments by counsel are not controlling.

The jury rejected defendant's defense, convicted him as charged, and the judge imposed the sentence we have previously recounted.

II.

In his first argument, defendant contends that three errors, considered cumulatively, deprived him of a fair trial. The errors were: the expert's reference to his experience of seeing full disc encryption only in child pornography cases;

the prosecutor's closing comment referencing delayed disclosure by other child molestation victims; and the "overly-detailed" fresh complaint of Amy's high school guidance counselor, which defendant claims "improperly inflamed the passion of the jury."

When addressing claims of cumulative error, the Supreme Court

> repeatedly [has] made clear that [t]he proper and rational standard [for the review of claimed trial errors] is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619 (1953); accord, State v. Marshall, 123 N.J. 1, 169-70 (1991), cert. denied, 507 U.S. 929 (1993).
>
> [State v. Wakefield, 190 N.J. 397, 537 (2007) (second and third alterations in original) (quoting State v. R.B., 183 N.J. 308, 333-34 (2005)).]

For that reason, "legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may [not] be invoked to upset an otherwise valid conviction . . . ." State v. Orecchio, 16 N.J. 125, 129 (1954). Thus, "[i]f a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. T.J.M., 220 N.J. 220, 238 (2015) (quoting State v. Weaver, 219 N.J. 131, 155 (2014)). Conversely, if "legal errors are of such

21

magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury." Orecchio, 16 N.J. at 129. "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538.

When deciding whether the probable effect of cumulative error was to render the underlying trial unfair, we must "necessarily look to the significance of the trial errors in light of the evidence presented to the jury." State v. Blakney, 189 N.J. 88, 96-97 (2006). Cumulative error cannot be viewed as harmless "when cast against the less than overwhelming evidence supporting a . . . conviction." Id. at 97. We must thus consider, among other factors, the quantum of evidence of a defendant's guilt, State v. Koskovich, 168 N.J. 448, 540 (2001); the phase of the trial in which the error occurs, ibid., (explaining that "a correct charge to the jury is singularly important for ensuring that jurors discharge their function accurately, fairly, and free from any impermissible influences"); and whether the errors "pervaded the trial[,] . . . [or] permitted [a party] to shift the jury's focus from a fair evaluation of the evidence to pursue instead a course designed to inflame the jury, appealing repeatedly to inappropriate and

irrelevant considerations that had no place in the courtroom[,]" Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 55-56 (2009).

Nathanson's testimony—that he encountered full disk encryption on defendant's tablet, that such encryption was rare, and he had only seen it in child pornography cases—was arguably not prejudicial when considered in the context of Amy's testimony and defendant's undisputed storage on his laptop of the messages and photos Amy had exchanged with her former boyfriend during the video incident. To be sure, a prosecutor is prohibited from eliciting improper or inflammatory testimony from a witness. See State v. McGuire, 419 N.J. Super. 88, 140-42 (App. Div. 2011). Here, however, Amy testified that as defendant emerged from the closet, he held his phone in such a way that he appeared to be recording her. Her impression was enforced by defendant saying he had done so. Given defendant's behavior, coupled with his maintenance of the screen shots he made of Amy's messages and photographs, a jury could infer defendant stored the more graphic video in an encrypted file on his tablet. The trial court's curative instruction was consistent with such an inference.

Defendant now argues the instruction was "woefully inadequate," though he agreed with it at the time of trial. He insists the trial court should have instructed the jury that it could not use Nathanson's testimony concerning

encryption for any purpose. Yet, at trial, when in summation the prosecutor told the jury, "[w]e don't know if the video existed, we don't know if it was on the encrypted computer or if it existed at all[,]" defendant did not object.

Of course, Nathanson's testimony concerning encryption and the prosecutor's eliciting it were both unnecessary. The focus of the indictment's twelfth count, possession of less than one hundred items depicting the sexual exploitation or abuse of a child, centered on defendant's possession of the nude screen shots he took of Amy and her former boyfriend. For that same reason, however, and given virtually irrefutable evidence defendant had downloaded the photographs from a cellular phone and maintained them on his laptop, any prejudice to defendant by Nathanson's reference to child pornography withered to little more than a harmless irrelevancy.

It was clearly improper, however, for the prosecutor to comment in summation on her own experience concerning other child molestation victims. By doing so, the prosecutor placed before the jury evidence relevant to Amy's credibility that had not been presented during the trial. Nonetheless, defendant did not object to the prosecutor's comment. The absence of a timely defense objection to a prosecutor's remarks in summation generally signifies that the remarks are not prejudicial. See State v. Ramseur, 106 N.J. 123, 323 (1987).

Here, it is understandable why defendant did not object to the prosecutor's comment. The reference to other children, and the context of the remark, involved a relatively insignificant aspect of the State's proofs. Moreover, Amy gave a clear, perfectly plausible explanation for her delayed disclosure of defendant's abuse. Defendant possessed photographs and, in Amy's mind, a video, all of which were humiliating to her. Thus, unlike situations of child molestation in interfamilial situations referenced by the prosecutor, here the threatened disclosure by defendant of the photographs and video provided a compelling reason for Amy's delayed disclosure of defendant's abuse. That evidence was particularly compelling considering defendant's undisputed possession of the photographs on his computer. In view of such compelling evidence, the prosecutor's reference to her experience with other child molestation victims can hardly be said to have been so prejudicial as to have prejudiced defendant's right to a fair trial, whether considered separately or in conjunction with the other alleged errors.

Nor do we find that the trial court's alleged error, if any, in permitting "excessive" fresh complaint testimony, tips the balance of the cumulative error scale in defendant's favor. The fresh complaint testimony defendant now complains of was cumulative of Amy's testimony, and only partially so. The

A-1686-17T3

witness's discussion of Amy's emotional state could hardly be said to have the same impact on the jury as Amy's detailed description of defendant's abuse and molestation of her. Moreover, following the witness's testimony and again in its general charge, the court instructed the jury it could consider the testimony in the narrow context of negating any inference to be drawn from Amy's failure to disclose the abuse, not as substantive or corroborative evidence.

Our conclusion defendant received a fair trial is also informed by the trial court's denial of a mistrial following the expert's testimony, and denial of defendant's post-trial motion for a new trial. It has long been recognized that "whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge . . . ." State v. Winter, 96 N.J. 640, 646-47 (1984). That is because "the trial judge, who has the feel of the case . . . is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." Id. at 647.

For similar reasons, "a motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000).

Here, the trial court, having the feel of the case, did not conclude the errors now asserted by defendant—as well as the others defendant alleged in his motion for a new trial—warranted disturbing the verdict. From our review of the trial record, we do not reach a different result. Amy's testimony was detailed and compelling. The eight images defendant possessed and maintained on his computer corroborated her testimony. It does not "clearly and convincingly appear[] that there was a manifest denial of justice under the law." R. 3:20-1.

Defendant's trial may not have been perfect, but it was fair. Accordingly, we affirm his convictions.

### III.

In his second argument, defendant raises four reasons why this matter must be remanded for resentencing. First, the trial court improperly found aggravating factors under N.J.S.A. 2C:44-1(a)(1) and (2). Second, the court improperly imposed consecutive terms of imprisonment. Third, the judgment of conviction erroneously orders a less restrictive sentence to be served before a more restrictive sentence without any explanation by the trial court. Last, the SCVTF penalty was mistakenly imposed without first conducting an ability-to-pay hearing.

A-1686-17T3

When a trial court has followed the sentencing guidelines, and its findings of aggravating and mitigating factors are supported by the record, we reverse only if the sentence "shock[s] the judicial conscience" in light of the particular facts of the case. State v. Roth, 95 N.J. 334, 364-65 (1984). Here, with two minor exceptions noted below, the trial court followed the sentencing guidelines and its findings of aggravating and mitigating factors are supported by the record. In view of defendant's relentless molestation of Amy over three years, at a time she was particularly vulnerable, his sentence is hardly conscience-shocking.

The trial court explained its reasons for finding the aggravating factors in N.J.S.A. 2C:44-1(a)(1) and (2), as well as its reasons for imposing consecutive sentences. In considering the first two aggravating factors, the court was guided by "the case law that says they should be considered jointly." With this preface, the court found "aggravating factor two, the harm to a vulnerable victim, specifically related to the defendant providing this young victim alcohol on . . . one occasion leaving her particularly unable to . . . resist when she was intoxicated." The court also found defendant was in a position of trust and had been Amy's confidante. The court's finding was well-supported by the record.

A-1686-17T3

Concerning the consecutive sentences, the court conducted the analysis required by State v. Yarbough, 100 N.J. 627, 643-44 (1985), and its fact finding supporting that analysis is amply supported by the record.  Defendant's arguments to the contrary are without sufficient merit to warrant further discussion.  R. 2:11-3(e)(2).

The judgment of conviction requires defendant to serve a four-year sentence on count one, and then an eight-year NERA term on count eight, consecutive to count one.  When "imposing a least restrictive or flat prison term preceding a more restrictive prison term, the court is directed to explain the consequence of any sequencing and to justify its exercise of discretion to impose the specific real-time consequence based on the court's finding and weighing of aggravating factors."  State v. Pierce, 220 N.J. 205, 205 (2014).  The State concedes the trial court did not comply with these requirements.  Accordingly, we remand this matter to the trial court to either provide its reasoning or to amend the judgment of conviction to the extent lesser restrictive or flat prison terms are required to precede more restrictive prison terms.

The trial court also imposed a SCVTF penalty of $1000 pursuant to N.J.S.A. 2C:14-10(a) without adequate consideration of defendant's ability to pay, contrary to the Supreme Court's directive in State v. Bolvito, 217 N.J. 221,

29                                                                    A-1686-17T3

234 (2014). Accordingly, that $1000 penalty in the judgment of conviction is vacated and the matter is remanded for the trial court to make the appropriate determination.

In summary, we affirm defendant's convictions and sentence except for the imposition of least restrictive or flat prison terms preceding more restrictive terms, and the $1000 SCVTF penalty. Concerning these two issues, we remand to the trial court to amplify its reasons and modify its decision if necessary.

Affirmed in part, remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION