**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5531-17T1

LAUREN GILL HAYSER and
JOHN HAYSER,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

GLENN PARKER, M.D.,
JEFFREY LIN, M.D.,
ATLANTIC SURGICAL GROUP,
P.A., KAREN BURKE, R.N.,
TRISHA NOVELLO, R.N.,
PATRICIA SPINA, R.N.,
ERIN CONROY, R.N., SOONMI
LIN, R.N., and OCEAN
MEDICAL CENTER,

      Defendants-Respondents,

and

THOMAS LAKE, III, M.D.,

      Defendant-Respondent/
      Cross-Appellant.

_____

Argued November 17, 2020 – Decided February 3, 2021

Before Judges Fisher, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2926-14.

Jonathan H. Lomurro argued the cause for appellants/cross-respondents (Lomurro, Munson, Comer, Brown & Schottland, LLC, attorneys; Jonathan H. Lomurro, of counsel; Christina Vassiliou Harvey, of counsel and on the briefs; Kristen M. Gaffey and Alan J. Weinberg, on the brief).

Kenneth M. Brown argued the cause for respondents Glenn Parker, M.D., and Atlantic Surgical Group, PA (Weber Gallagher, attorneys; Kenneth M. Brown, of counsel and on the brief; Peter Espey, on the brief).

Sharon K. Galpern argued the cause for respondent Jeffrey Lin, M.D. (Stahl & DeLaurentis, PC, attorneys; Sharon K. Galpern, on the brief).

Michael E. McGann argued the cause for respondents Karen Burke, R.N., Trisha Novello, R.N., Patrice Spina, R.N., and Ocean Medical Center (Orlovsky, Moody, Schaaff, Conlon & Gabrysiak, attorneys; Michael E. McGann, of counsel and on the brief; Anthony W. Liberatore, on the brief).

Herbert Kruttchnitt III argued the cause for respondents Erin Conroy, R.N., and Soonmi Lim, R.N.[1] (Dughi, Hewit & Domalewski, attorneys; Herbert Kruttchnitt III, of counsel and on the brief; Shawna K. Bishop, on the brief).

---

[1] In the complaint plaintiffs identified this defendant as Soonmi Lin, R.N. However, in her appellate brief, she identifies herself as Soonmi Lim, R.N. We refer to her as Soonmi Lim, the name she uses in her brief.

2

A-5531-17T1

Thomas J. Heavey argued the cause for respondent/cross-appellant Thomas Lake, III, M.D. (Grossman, Heavey & Halpin, PC, attorneys; Thomas J. Heavey, of counsel and on the briefs; Morgan Rose Montano, on the briefs).

PER CURIAM

After having surgery for the removal of a cancerous tumor, Lauren Gill Hayser (plaintiff) experienced post-surgical complications stemming from a bowel leak that caused an infection. Plaintiff and her husband John Hayser (collectively plaintiffs) assert that defendants were negligent in their post-surgical treatment of her, specifically in their purported failure to monitor, investigate, or report post-operative signs of infection. After an eleven-day trial, a jury found no deviation from the accepted standards of practice. Plaintiffs appeal that no-cause judgment and the trial judge's subsequent denial of their motion for a new trial, arguing that the verdict was against the weight of the evidence and that they were deprived of a fair trial by errors made in the jury-selection process and during the trial. Defendant Thomas Lake III, M.D., cross-appeals the trial judge's denial of his motion for involuntary dismissal under Rule 4:37-2(b). For the reasons that follow, we affirm.

## I.

On May 28, 2013, Dr. Lake, a colorectal surgeon with defendant Atlantic Surgical Group, P.A. (Atlantic Surgical Group) operated on plaintiff at Ocean Medical Center, performing a bowel resection to remove a malignant tumor. After surgery, plaintiff was placed in the post-anesthesia care unit. Dr. Lake wrote a post-operative order detailing the care to be provided to plaintiff by the nursing staff, including standing order no. 48, which directed staff to call a surgeon if a patient was tachycardic, meaning had a heart rate that exceeded 120 beats per minute. Hospital protocol also required a nurse to notify a physician if a post-operative patient's white blood count or pulse rate became elevated. Later that day, plaintiff was transferred to a medical/surgical floor in the hospital. Over the next two days, plaintiff continued to improve and showed no signs of a bowel leak or infection.

Defendant Soonmi Lim, R.N., cared for plaintiff on the evening of May 30, 2013. Lim did not contact a surgeon when plaintiff's heart rate reached 122 at 8:00 p.m.; when her heart rate was noted at 10:43 p.m. on her chart it was 98. Defendant Erin Conroy, R.N., began to care for plaintiff the following morning. Lab reports from blood taken the prior evening showed that plaintiff's white

A-5531-17T1

blood count had increased to 15,700 per microliter of blood. A normal range is 4,500 to 11,000 per microliter of blood.

On May 31, 2013, during morning rounds, defendant Jeffrey Lin, M.D., a general surgeon with Atlantic Surgical Group, ordered that plaintiff's cardiac monitor be discontinued. Nursing staff would continue to check her vital signs every four hours. Dr. Lin testified that an elevated heart rate of 122 and a white blood count of 15,700 did not indicate a bowel leak because plaintiff was making clinical progress, did not look sick, was healing, was not tired or confused, and had normal kidney function. He stated that even if he had known about plaintiff's tachycardic episode, he would not have ordered a CT scan to determine if she had a bowel leak based on that single number, noting that an elevated heart rate can be caused by pain, exertion, and anxiety as well as infection.

At 4:00 p.m. on May 31, 2013, plaintiff's heart rate increased to 132. Nurse Conroy did not contact the surgeons regarding the elevated heart rate or white blood count and did not include the tachycardic episode in her notes. That evening, while nurse Lim cared for her, plaintiff had several sustained tachycardic episodes. Nurse Lim did not call the surgeons or document those episodes in her notes, but the information was available on computerized

hospital records. By 4:00 a.m. on June 1, 2013, plaintiff's heart rate had fallen to ninety-seven, which was within the normal range.

During that day, while defendant Trisha Novello, R.N., cared for her, plaintiff's heart rate was normal, she reported a pain level of zero, and she did not have a fever, but lab reports from blood taken the prior evening indicated that her white blood count had increased to 22,000 per microliter of blood. During rounds that afternoon defendant Glenn Parker, M.D., a colorectal surgeon with Atlantic Surgical Group, examined plaintiff. He reported in his progress notes that she was awake and alert and had normal vital signs, including a pulse of ninety-six, her incision was healing appropriately, and her ostomy was functioning properly. He also noted that her white blood count was 22,000 per microliter of blood. He recommended that she be discharged that day, wrote a discharge order, gave her a prescription for Percocet for pain, and ordered that she have follow-up care with visiting nurses. She was discharged that afternoon "in stable condition." Defendant nurses Novello, Patricia Spina, R.N., and Karen Burke, R.N., assisted in the discharge. Nurse Burke noted that at the time of discharge plaintiff had no complaints of pain and was alert, oriented, and excited to go home. None of the nurses alerted the doctors to plaintiff's elevated white blood count.

A-5531-17T1

On June 3, 2013, plaintiff called the Atlantic Surgical Group and spoke with Dr. Lake. She asked for a different pain medication because Percocet was not agreeing with her. She testified that she called also because her legs were swollen, but written notes from the call do not reference any report of swelling in her legs or increased pain. The visiting nurse who saw plaintiff that day did not document any increased pain or swelling of her legs.

On June 6, 2013, plaintiff called again and spoke with Dr. Parker. She asked for a prescription for antibiotics because a malodorous fluid was draining from her incision line. Dr. Parker told her that he would not prescribe an antibiotic over the telephone and advised her either to come to the office or to go to the emergency room. She did not follow that advice. Later that day, when her parents attempted to assist her out of bed, fluid sprayed out of her abdomen. Her mother called an ambulance, and plaintiff was taken to the emergency room at Jersey Shore University Medical Center.

When she arrived at the emergency room, plaintiff was in septic shock, feculent discharge was coming from her incision, her abdomen was distended and tender, her white blood count was 26,000 per microliter of blood, she was tachycardic, and her blood pressure was low. Dr. Parker performed emergency surgery and found where the bowel had been resected a 1.5 cm hole and an

anastomotic leak, with fecal matter flowing into her peritoneal cavity. He removed the rest of her colon because it was ischemic, took out the colostomy, and created a new ileostomy on the other side of her abdomen. Plaintiff remained intubated and sedated for a week, was discharged eighteen days after the surgery, and stayed at a rehabilitation facility for eight days.

Plaintiffs filed a complaint alleging medical negligence against plaintiff's treating physicians, Drs. Lake, Lin, and Parker, and their medical group, Atlantic Surgical Group, and against her treating nurses Burke, Novello, Spina, Conroy, and Lim, and Ocean Medical Center. Plaintiffs' colorectal surgical expert opined that each of the doctors had deviated from the accepted standard of practice: (i) Dr. Lin, by failing to investigate an intra-abdominal cause of plaintiff's elevated white blood count and failing to order a CT scan to determine if she had an abdominal leak; (ii) Dr. Parker, by discharging plaintiff when her white blood count was almost twice the normal range; and (iii) Dr. Lake, by failing to recognize that plaintiff's report of increased pain and swollen legs was a possible sign of abdominal infection. Plaintiffs' nursing expert, Lisa Homa, R.N., opined that the nurses deviated from accepted standards of nursing practice: (i) defendants Lim and Conroy by failing to assess, monitor, and communicate to a doctor plaintiff's tachycardia and elevated white blood count

A-5531-17T1

during their shifts; and (ii) defendants Novello, Spina, and Burke by failing to advise doctors that plaintiff's white blood count was reported as elevated during their shifts and that she had previously had episodes of tachycardia.

After an eleven-day trial,[2] the jury returned a verdict finding that plaintiffs had not proven any defendant deviated from the accepted standards of practice. Having found no deviation, the jury did not reach the remaining questions on the verdict sheet regarding proximate causation or damages. The trial judge entered a final judgment dismissing plaintiffs' claims with prejudice based on the jury's verdict. He denied plaintiffs' subsequent motion for a new trial pursuant to Rule 4:49-1 and to vacate the judgment.

## II.

On appeal, plaintiffs argue they are entitled to a new trial because the trial judge committed errors in the jury-selection process, during the trial, and in denying plaintiffs' motion to reopen their case and motion for a new trial.

## A.

We begin our analysis by addressing plaintiffs' argument that the jury-selection process was flawed and led to an unjust result. Plaintiffs fault the

---

[2]  Prior to opening statements, Dr. Parker reached a settlement with plaintiffs. Atlantic Surgical Group remained in the case for its alleged vicarious liability for Dr. Parker's actions.

judge for both compelling too many sidebar conferences and for doing too much in open court. Plaintiffs also argue the judge erred by not correctly adjusting the number of plaintiffs' peremptory challenges in light of the numerosity of similarly-situated defendants and by failing to respond to jury bias against plaintiffs. We see no evidence that the jurors who were impaneled – none of whom plaintiffs sought at any time to be excused – were biased against plaintiffs or their counsel or were otherwise tainted.

Before jury selection began, plaintiffs requested additional peremptory challenges, asserting that defendants had a "concerted similar interest" and that plaintiffs, thus, were entitled to additional challenges under Velazquez v. Portadin, 163 N.J. 677 (2000). The trial judge did not deny plaintiffs' request but indicated that he was inclined to grant it "once you have exhausted your challenges," stated he would determine the number of additional challenges to grant "depend[ing] on what the landscape looks like at that time, as to how many the defense has exercised," and concluded that "the playing field" was "not level" and that plaintiffs "would be entitled to additional challenges." Plaintiffs' counsel did not object to that procedure. After plaintiffs' counsel had made his sixth peremptory challenge, he reminded the judge that he had used his last challenge. The judge told him: "once we go through this you can make an

application for additional [j]urors after we've gone through everybody. It's premature. It's not your turn yet." Counsel did not object but thanked the judge.

Plaintiffs' counsel subsequently asked for a sidebar conference, seeking to make a belated request to strike a juror for cause and to renew his application for additional peremptory challenges. When the judge granted his request to strike the juror for cause, counsel did not renew his application for additional challenges. The judge proceeded with voir dire of additional potential jurors.

Later in the process, plaintiffs' counsel asked for a sidebar and advised the judge that he had seen juror number four turn to other jurors and refer to him as "a piece of shit." After conducting an off-the-record conference with counsel outside the presence of the jurors, the judge questioned the jurors individually, beginning with juror number four, who admitted he had made these comments to a juror behind him: "here we go again," "[e]verybody just goes to sidebar," "why don't they just ask whoever wants to serve to raise their hand and they cut out all this stuff," "everybody agreed but that guy," indicating plaintiffs' counsel, and "there we go, he's getting rid of somebody else again." He denied making any other comment about plaintiffs' counsel.

Four jurors told the judge that they had not heard juror number four's comments. Four jurors told the judge that they had overheard juror number

11

four's comments, but that the comments would not impact their ability to be fair and impartial. None of them reported hearing juror number four call plaintiffs' counsel a "piece of shit." Juror number three understood that juror number four was "upset" with plaintiffs' counsel because "everybody else was okay with the [j]ury," but she thought that juror number four's comment was unfair because plaintiffs' lawyer was doing his job. Juror number eight overheard juror number four say that plaintiff's counsel was "picky" or a "pain" but stated that if he were her attorney, she would want him to be picky. Juror number six said that he had heard a comment in reference to an attorney that "I can't believe he's doing that, doing another exception or exclusion again," and told the judge that although he understood juror number four's frustration "from being here," he thought counsel were doing their jobs "to vet the [j]urors as best they can." Juror number five could not recall specifically what was said but described it as "like jokingly, oh come on, it's taking forever or that kind of thing." Like the other jurors who had heard something, she confirmed that the comments would not impact her ability to be fair and impartial. Plaintiffs' counsel moved to excuse only juror number four. The judge granted that motion. Plaintiffs' counsel did not move to excuse any other juror.

Before jury selection resumed, plaintiffs' counsel reminded the judge that he had used all of his challenges, and the judge responded, "[w]ell, yes. All right." After questioning her, the judge excused the remaining potential juror from the first panel for cause and brought up a second panel of potential jurors. The judge excused one potential juror for cause at plaintiffs' counsel's request. The judge excused another potential juror after she had stated that defendant Ocean Medical Center "saved my husband's life." Plaintiffs' counsel later expressed a concern that that comment was made in open court. The judge responded: "People go to hospitals, they save lives. I mean, that's why we go to hospitals. That's not unduly prejudicial. I'm going to caution everybody that they have to be fair and impartial and listen to the law. I'm not going to grant [] an application for that." Plaintiffs' counsel did not object and did not move to strike the panel but stated, "[t]hat's fine. No, that's fine. That's all."[3]

On plaintiffs' counsel's next turn to make a peremptory challenge, the judge did not skip over him but looked to him. Counsel did not attempt to make a peremptory challenge, did not ask for any additional peremptory challenges,

_____

[3] During oral argument on plaintiffs' post-trial motion for a new trial, plaintiffs' counsel stated that he moved for a mistrial on this issue but the transcript does not support that contention.

and did not ask to excuse any juror for cause.  Instead, he indicated that the jury was satisfactory.  With no objection from counsel, the judge swore in the jury.

To protect a litigant's fundamental right to an impartial jury, a trial judge must ensure that the jury-selection process is fair.  Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009).  A trial judge must also protect a jury from "the taint of outside influences and extraneous matters."  State v. R.D., 169 N.J. 551, 557 (2001).  A trial judge has the discretion to decide whether to question potential jurors in open court or at sidebar.  Pellicer, 200 N.J. at 41.  "[O]ur jury selection mechanisms are designed to create the opportunity in which any relevant, preconceived notions will be revealed and explored, and all pre-existing biases will be exposed."  Id. at 42.

Faced with a concern about improper influence on the jury, "the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality."  State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997).  "'[T]endency' to influence the verdict – not probability or likelihood – is the standard for determining whether a new trial should be granted."  Barber v. Shop-Rite of Englewood & Assocs., 406 N.J. Super. 32, 56 (App. Div. 2009).

14

Rule 1:8-3(c) entitles each party to six peremptory challenges and allows the trial court in its discretion to award a party additional challenges if the case involves "multiple parties having a substantial identity of interest in one or more issues." That discretion should be exercised "in order to avoid unfairness." Ibid. In Velazquez the plaintiffs had used all of their challenges and were dissatisfied with the jury. When the plaintiffs asked for additional challenges, the trial court denied the request. Concerned that a plaintiff facing multiple defendants could be placed at a disadvantage in rejecting prospective jurors peremptorily – a disadvantage that could compromise the right to an impartial jury – our Supreme Court held that a trial court must "analyze the positions of the multiple parties for identity purposes to determine whether the adversary will be prejudiced unless more peremptory challenges are awarded." Velazquez, 163 N.J. at 691-92.

The better course may have been for the trial judge to address plaintiffs' request for additional peremptory challenges before jury selection began. Finalizing the number of peremptory challenges early in the process has the advantage of informing all parties as to the limits they will face in making peremptory challenges during jury selection. We see no advantage in waiting. However, we find no prejudice and no reversible error in the trial judge's

decision to wait to set the number of peremptory challenges. In <u>Russell v. Rutgers Community Health Plan, Inc.</u>, 280 N.J. Super. 445, 456 (App. Div. 1995), before jury selection, the plaintiffs moved for additional peremptory challenges. The trial judge denied the plaintiffs' application without prejudice and told them that they could renew it later "should prejudice arise." <u>Ibid.</u> We affirmed that decision, finding that the plaintiffs had not shown any prejudice.

Here, the trial judge did not deny plaintiffs' application for additional peremptory challenges and made clear his conclusion that they were entitled to additional challenges. Like the trial judge in <u>Russell</u>, he chose to hold off until later in the jury-selection process to set the number of additional challenges – a procedure to which plaintiffs did not object. Like the plaintiffs in <u>Russell</u>, plaintiffs have failed to show that they were prejudiced by that procedure. The trial judge did not deny any request to strike a juror. Plaintiffs have not identified any juror they did not want on the jury or any sidebar application to strike a juror for cause that they would not have made had the judge set earlier the number of additional peremptory challenges. Ultimately, unlike the plaintiffs in <u>Velazquez</u>, plaintiffs advised the judge that the make-up of the jury was satisfactory. We see no prejudice.

With respect to juror number four's comments, the trial judge conducted the required "probing inquiry," questioning each juror as to what was heard and exploring whether the jurors could remain fair and impartial. See Scherzer, 301 N.J. Super. at 487-88. From that process, the trial judge was able to determine that the remaining jurors were not influenced by juror number four's comments and harbored no prejudice as to any party or counsel – such that plaintiffs' counsel did not ask that any other juror be excused. We see no error.

The trial judge acted within his discretion in questioning jurors in open court. Pellicer, 200 N.J. at 41. In her comment about Ocean Medical Center, the potential juror did not identify any doctors or nurses involved in her husband's care or provide any details regarding her husband's treatment. As the trial judge noted in denying plaintiffs' post-trial motion, potential jurors know that hospitals are in the business of trying to save people's lives. Before their deliberations, the judge instructed the jurors that "[y]our decision in the case must be based solely upon the evidence presented and my instructions on the law." The excused potential juror's single, isolated comment did not have the effect of tainting the jury and is not grounds for a new trial.

B.

Plaintiffs appeal the trial judge's denial of their post-trial new-trial motion, which was based in part on the jury's failure to find that nurses Conroy and Lim and Dr. Parker deviated from the applicable standards of care.[4] They argue the judge's denial was against the weight of the evidence. We disagree.

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge – whether there was a miscarriage of justice under the law." Risko v. Thompson Muller Auto. Grp. Inc., 206 N.J. 506, 522 (2011); see also Hayes v. Delamotte, 231 N.J. 373, 386 (2018); R. 2:10-1. "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes, 231 N.J. at 386 (quoting Risko, 206 N.J. at 521-22).

---

[4] Plaintiffs brief this argument only as to these three defendants but assert that they have not abandoned the argument as to the other defendants. That, however, was their last chance to raise it as to other defendants because "[a]n issue not briefed is deemed waived." W.H. Indus., Inc. v. Fundicao Balancins, Ltda, 397 N.J. Super. 455, 459 (App. Div. 2008). Accordingly, we consider this argument of their appeal only as to defendants Conroy, Lim, and Parker.

A-5531-17T1

A "jury verdict is entitled to considerable deference." Risko, 206 N.J. at 521. "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005); see also Dutton v. Rando, 458 N.J. Super. 213, 224 (App. Div. 2019). In an appeal of a decision on a motion for a new trial, we must give "due regard to the opportunity of the jury to pass upon the credibility of the witnesses," R. 4:49-1(a), and "'due deference' to the trial court's 'feel of the case.'" Risko, 206 N.J. at 522 (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)).

To prevail in a medical malpractice action based on a deviation from the standard of care, a plaintiff must demonstrate that the medical professional deviated from an established standard of care. Newmark-Shortino v. Buna, 427 N.J. Super. 285, 304 (App. Div. 2012). Plaintiffs assert they proved a deviation as to defendants Conroy and Lim because they established those nurses had as a matter of law an absolute duty, based on standing order no. 48, to call a doctor when plaintiff's heart rate exceeded 120 beats per minute and that they failed in that duty by not calling a doctor when plaintiff's heart rate exceeded 120 beats per minute. They assert they proved a deviation as a matter of law as to Dr.

Parker because he discharged plaintiff without taking any other action even though her white blood count was above normal at 22,000 per microliter of blood.

The theme of plaintiffs' case was that defendants failed to take certain actions when plaintiff's heart rate and white blood count exceeded a particular number. Defendants' theme was that "[y]ou don't just treat a patient's number, you treat the patient." The jury had before it evidence that supported defendants' theme, and it was free to accept that evidence. Evidence regarding a standard order or procedure may inform the jury as to the existence of a duty, but questions of fact as to the scope of that duty may remain. Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 342 (1994). Defense witnesses testified that even with standing order no. 48, nurses consider other factors regarding a patient's condition before contacting a doctor because a single number – especially a number that could otherwise be explained – did not raise an alarm in a clinically-stable patient showing no other signs of infection or distress. Dr. Parker[5]

_____

[5] Without citation to the record, plaintiffs assert in their appellate brief that Dr. Parker made an "admission of a breach," "confirmed the nurses misled him," and "conceded" that "he did nothing but discharge his patient" and claimed defense medical expert Dr. Bruce Gingold testified that Dr. Parker had deviated from a standard of care by discharging plaintiff. Our review of the record does not reveal any such testimony by Dr. Parker or Dr. Gingold. Plaintiffs also rely

acknowledged that he had discharged plaintiff with an elevated white blood count but disputed that he took no other action, noting that he: examined plaintiff; instructed her to contact him or his partners if she experienced any changes or had any fever, chills, nausea, vomiting, extended abdomen, or change in function of the ostomy; and ordered visiting nurses to see plaintiff at home.

Plaintiffs accuse the judge of treating them "hostilely" in their motion for a new trial because plaintiffs had failed to move for a directed verdict during trial. We see no hostile treatment by the judge, who correctly pointed out that plaintiffs had not moved during trial[6] for a directed verdict on the issue of defendants' deviations from a standard of care and had not objected to the jury interrogatories and charge regarding defendants' alleged deviations. To the contrary, the judge fairly noted that plaintiffs' decisions not to move for a directed verdict and not to object to the jury interrogatories or charge may have been part of plaintiffs' trial strategy. More important, in denying plaintiffs' motion, the judge reviewed the evidence presented and concluded that the jury

---

on a case, <u>Cowley v. Virtua Health Sys.</u>, 456 N.J. Super. 278 (App. Div. 2018), which was reversed after plaintiffs submitted their appellate briefs, 242 N.J. 1 (2020).

[6] Submitting a pre-trial brief in anticipation of a motion for a directed verdict is not the same thing as actually making the motion during trial.

had before it sufficient evidence to support the verdict rendered. We agree with the judge's analysis.

C.

Plaintiffs fault defense counsel for comments made during opening statements, arguing that those comments biased the jurors against plaintiff. We see no undue prejudice from counsels' comments, and any prejudice was cured by appropriate instructions given by the judge.

Two lawyers commented in their opening statements on plaintiff's pre-surgery decision to hold off getting a recommended CT scan until after a visit with her parents.[7] One of those lawyers stated, "[t]his case is all about responsibility, Dr. Parker has taken his responsibility, but it's a two-way street . . . . Patients have a responsibility also." Plaintiffs' counsel objected to that comment. The judge asked him what remedy he was seeking and if he was seeking a mistrial. He told the judge that he was not moving for a mistrial but was asking the judge to issue a curative instruction. The judge granted that request and told counsel he would give a curative instruction clarifying that any reference to plaintiff having a responsibility related only to her June 6, 2013

---

[7] Plaintiffs' complain that defense counsel "strategically blamed" plaintiff throughout the trial. They fail to support that assertion with citations to the record. Without citations to the record, we cannot consider that broad allegation.

decision not to go immediately to the emergency room or the doctors' office. Counsel did not object to the proposed instruction and did not object after the judge gave the instruction.

Plaintiffs accuse another attorney of inflaming the jury by stating that plaintiffs' counsel:

> has a job to do because he has to figure out how to blame a whole lot of people for a decision that only one person made. Because he's already settled with the person that made that decision. So now in order to ensnare other people into that decision, he's going to have to work pretty hard.

Plaintiffs' counsel objected to that comment and asked for a curative instruction that the jurors were not to speculate as to the reason for the settlement with Dr. Parker, plaintiffs had always maintained that the defendant nurses were negligent, and the jury was to disregard any comment about plaintiffs' changing their position. The judge instructed the jurors to focus on the evidence:

> Sometimes people will say things that they probably shouldn't have and, . . . your job is to listen to the evidence, and that's going to start right now.
>
> Any comments made by the attorneys or questions that they shouldn't have asked or comments that they threw in that were just simply gratuitous I'm going to ask you to overlook. Focus on the evidence, focus on the answers that the witness[es] provide you . . . . Focus on the evidence, try to keep the distractions at bay.

Denying plaintiffs' post-trial motion for a new trial based on this issue, the judge explained that he gave a more general instruction than the specific instruction requested by plaintiffs' counsel because he "felt that repeating something that should not have been said the first time would only be ringing the bell twice" and "felt that it was best . . . not to underline an issue that they've heard, but to tell them you've heard some noise.  Disregard it.  I want you to focus on the evidence."

Plaintiffs also complain on appeal about comments to which they did not object at trial.  See State v. Timmendequas, 161 N.J. 515, 576 (1999) (finding that "[f]ailure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made" and "deprives the court of the opportunity to take curative action"); see also Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) (applying plain-error standard when party failed to object during trial).  One defense counsel said in his opening statement that the jurors may someday be litigants and that if they decide this case without sympathy, they will have more confidence in having a jury of their peers.  They did not object at trial but later, in their post-trial and now, plaintiffs characterize that comment as an improper invocation of the "golden rule."  Another counsel discussed a nurse's ability to use her judgment in monitoring

and communicating with doctors about a patient's condition. Again, plaintiffs did not object at trial and did not criticize those comments as being contrary to a ruling by the court that nursing judgment did not apply and as being part of a pattern of attempts to bias the jury until they filed their post-trial motion and this appeal.

The purpose of an opening statement is to "inform the jury in a general way of the nature of the action and the basic factual hypothesis projected, so that they may be better prepared to understand the evidence." Farkas v. Bd. of Chosen Freeholders, 49 N.J. Super. 363, 367-68 (App. Div. 1958); see also Amaru v. Stratton, 209 N.J. Super. 1, 15 (App. Div. 1985). In an opening statement, saying something a lawyer knows cannot be proven or is legally inadmissible or "derisive . . . about parties, their counsel, or their witnesses" is improper. Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 178 (App. Div. 2010). A trial judge has broad discretion in affording a remedy for unduly prejudicial comments made during an opening statement, including granting a motion for a mistrial, giving curative instructions, or taking other curative action. Amaru, 209 N.J. Super. at 15. We do not disturb those curative efforts absent an abuse of discretion. Ibid. "Fleeting comments, even if improper, may

not warrant a new trial, particularly when the verdict is fair." Jackowitz, 408 N.J. Super. at 505.

A lawyer invokes the golden rule when he argues to a jury that "you should do unto others as you would wish them to do unto you . . . . " Geler v. Akawie, 358 N.J. Super. 437, 464 (App. Div. 2003). That argument is improper because it suggests to jurors that they should decide the case based on their personal interest and bias instead of the evidence. Id. at 464-65. By encouraging jurors to decide the case without sympathy, counsel was not asking jurors to place themselves in defendants' positions or to decide the case based on their personal interests and, thus, did not invoke the golden rule. Counsel's comment about a nurse using her judgment fits with defendants' theme that a medical professional treats the entire patient and not a single number and constitutes fair comment on the anticipated presentation of evidence, not an improper attempt at bias.

The other comments made by defense counsel in their openings did not rise to the level of derision or knowing wrongdoing that drew our rebuke in Szczecina, 414 N.J. Super. 173. Moreover, the curative instructions given by the judge were appropriate, fair, and sufficient to address any concerns. We see no abuse of discretion.

D.

Plaintiffs argue that the judge erred by improperly limiting the direct examination of their standard-of-care expert, Dr. Richard Goldstein, and their cross-examination of defendant Dr. Lake and by denying their motion to re-open the case to recall Dr. Goldstein. We disagree.

We defer to a trial judge's evidentiary rulings absent an abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015); see also Ehrlich v. Sorokin, 451 N.J. Super. 119, 128 (App. Div. 2017). That standard applies to decisions about the testimony of expert witnesses, see Townsend v. Pierre, 221 N.J. 36, 52 (2015), and treating physicians, see Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 581 (2016). We reverse a trial judge's decision regarding cross-examination only when "clear error and prejudice" have been shown. State v. Gaikwad, 349 N.J. Super. 62, 86-87 (App. Div. 2002). We review a motion to reopen a case under an abuse-of-discretion standard. Tomney v. Ebeling, 105 N.J. Super. 66, 70 (App. Div. 1969).

A judge may preclude expert testimony "on a subject not covered in the written reports furnished by an adversary." Congiusti v. Ingersoll-Rand Co., 306 N.J. Super. 126, 131 (App. Div. 1997). A party may avoid preclusion of expert testimony not contained in a written report if the party can demonstrate

"(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would result from the admission of the evidence." Westphal v. Guarino, 163 N.J. Super. 139, 145-46 (App. Div.), aff'd o.b., 78 N.J. 308 (1978); see also Conrad v. Robbi, 341 N.J. Super. 424, 441 (App. Div. 2001).

Plaintiffs assert that Dr. Goldstein was not permitted to testify that a standard of care required Dr. Lin to investigate the cause of plaintiff's increased white blood count "by doing something, which included, but was not limited to, ordering a CT scan." Defendants argue that plaintiffs attempted improperly to add at trial new opinions about Dr. Lin that went beyond the opinions contained in Dr. Goldstein's reports and his discovery-deposition testimony.

In his first report Dr. Goldstein opined that "Dr. Lin deviated from the standard of care by not investigating the source of [plaintiff's elevated white blood count] on May 30, 2013" and that "[t]his investigation would have been a CT scan of the abdomen." He did not impose any other standard of care or investigative effort with respect to Dr. Lin. In his first supplemental report, Dr. Goldstein stated that the "rise in [white blood count] should have been a subject of great concern, along with the non-resolving tachypnea and tachycardia." But he did not opine that the standard of care required him to investigate the

tachypnea or tachycardia and did not name any other investigative action Dr. Lin should have taken. During his discovery deposition, Dr. Goldstein stated for the first time that the "first test that should have been done [by Dr. Lin] was a urinalysis and a chest x-ray." He explained that "[i]t's much more common for a postoperative patient to have a urinary infection or to have pneumonia than it is to have an anastomotic leak. These are routine things." He stated that he was not criticizing Dr. Lin for failing to order a urinalysis or x-ray and acknowledged that an x-ray or urinalysis would have shown nothing because plaintiff did not have pneumonia or a urinary tract infection. He expressly confirmed that his criticism of Dr. Lin was that he had failed to order a CT scan of the abdomen given the increase in plaintiff's white blood count.

At trial, counsel for Dr. Lin objected when Dr. Goldstein opined that Dr. Lin should have been concerned not only by plaintiff's elevated white blood count but also by her elevated heart rate. At sidebar, the judge conducted with counsel an extensive review of Dr. Goldstein's reports and deposition testimony and correctly concluded that Dr. Goldstein had never opined previously that a standard of care concerning plaintiff's tachycardia and tachypnea applied to Dr. Lin and that the applicable standard of care was based on the elevated white blood count. He held that "[h]e's already testified that it's an area of concern. I

think we ought to leave it where it is. I'm not going to allow him . . . to indicate that it's a deviation from the standard of care not to notice the tachycardia and the tachypnea." Plaintiff's counsel responded by stating that he was "[n]ot going there."

The judge and counsel then discussed whether Dr. Goldstein could testify that Dr. Lin had deviated from the standard of care by failing to order a urinalysis or x-ray. The judge expressed concern that Dr. Goldstein would "suggest to the jury that Dr. Lin could have done a million things, and then not criticizing that inaction as being a deviation of standard of care." The judge asked Dr. Goldstein, "[w]hat do you do in order to find a leaking anastomosis?," and he responded, "[t]he most common way in which it's done is with a [CT] scan." The judge correctly concluded that the failure to order the CT scan was the deviation from the standard of care identified by Dr. Goldstein before trial.

The judge properly limited Dr. Goldstein's testimony and denied plaintiffs' motion to re-open their case. The only standard-of-care opinion Dr. Goldstein actually rendered before trial about Dr. Lin was that he should have investigated plaintiff's elevated white blood count. The only deviation he actually identified was the failure to order the CT scan. In his deposition, he expressly stated that he was not criticizing Dr. Lin for not ordering an x-ray or urinalysis, tests that

would have revealed nothing about the bowel leak. Defendants reasonably would have been surprised by and prejudiced by the addition of a new standard of care and new deviations at trial.

Plaintiffs argue on appeal that they "attempted to cross-examine Dr. Lake as to his opinions, but the trial court would not permit the inquiry." Dr. Lake's counsel objected when plaintiffs' counsel asked Dr. Lake if he could "log onto a computer in your office and actually see [plaintiff's] chart from Ocean Medical Center?" In a sidebar discussion with counsel, the judge noted that plaintiffs had not alleged that Dr. Lake had deviated from a standard of care by not reviewing plaintiff's hospital chart when he spoke with her by telephone after her discharge. Plaintiffs' counsel stated that he wanted to ask Dr. Lake, "[d]oesn't the standard of care require you to see what her condition was at discharge?" The judge declined to allow that question because "[t]here's no standard of care that requires him to do that" but allowed counsel to "ask him what he did, and you can ask him did he have the ability to do that, but that's the end of it." Dr. Lake testified that he had access to the hospital chart from his office and that he did not access it.

"The testimony of a treating physician is subject to an important limitation. Unless the treating physician is retained and designated as an expert

A-5531-17T1

witness, his or her testimony is limited to issues relevant to the diagnosis and treatment of the individual patient." Delvecchio, 224 N.J. at 579; see also Stigliano v. Connaught Lab., Inc., 140 N.J. 305, 314 (1995).

The judge correctly rejected plaintiffs' attempt to elicit testimony from Dr. Lake establishing a new standard of care or deviation that required him to review plaintiff's hospital chart when plaintiff called his office about her pain medication. Plaintiffs had not alleged or established that standard of care or deviation before trial through their experts or even through prior testimony of Dr. Lake. Asking Dr. Lake whether the standard of care required him to "see what her condition was at discharge" before speaking to her was not an attempt to elicit proof of an alleged deviation, see, e.g., Lanzet v. Greenberg, 126 N.J. 168, 191 (1991), but was an attempt to impose a new standard of care or deviation on Dr. Lake, who reasonably would have been surprised and prejudiced by the addition of that new standard of care or deviation at trial.

Plaintiffs argue for the first time in their appellate reply brief that the judge should have permitted them to establish through defendant Dr. Lake's testimony standard-of-care opinions, which plaintiffs' experts did not make, that would have "impeached" Dr. Parker and Dr. Lin. Plaintiffs do not identify what those impeaching standard-of-care opinions would have been. They do not cite

to any provision in the record where they sought to cross-examine Dr. Lake regarding the standards of care applicable to Drs. Parker or Lin or where the judge prevented them from doing so. They did not make that argument at trial or in their initial appellate brief. See N.J. Div. of Youth and Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (finding that "issues not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest"); Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001) (declining to decide issue raised improperly for the first time in appellate reply brief). We decline to consider this argument.

E.

Plaintiffs argue that the judge erred in "merging the vicarious liability charge with the settling defendant charge" and in its charge and juror interrogatories regarding Dr. Lake. We disagree.

In an appeal challenging a jury charge, we "must examine the charge as a whole, rather than focus on individual errors in isolation." Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002). We consider "whether an erroneous charge may have affected the trial's result." Washington v. Perez, 219 N.J. 338, 351 (2014). We generally do not reverse based on an erroneous jury charge if it was

"incapable of producing an unjust result or prejudicing substantial rights." Fisch v. Bellshot, 135 N.J. 374, 392 (1994); see also Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013). "A trial court's interrogatories to a jury are not grounds for a reversal unless they were misleading, confusing, or ambiguous." Sons of Thunder, Inc.v. Borden, Inc., 148 N.J. 396, 418 (1997); see also Flood v. Aluri-Vallabhaneni, 431 N.J. Super. 365, 379 (App. Div. 2013). "Where a charge is not objected to at trial, it will only be reversed if there is 'plain error.'" Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573 (App Div. 1995) (citing R. 2:10-2). "The absence of an objection suggests that trial counsel perceived no error or prejudice, and, in any event, prevented the trial judge from remedying any possible confusion in a timely fashion." Id. at 573-74.

The judge charged the jury in accordance with Model Jury Charge 1.17 ("Instructions to Jury in Cases in which One or More Defendants Have Settled With the Plaintiff") and added: "Atlantic Surgical Group is in this case with respect to Dr. Parker, on a theory of vicarious liability. Even though Dr. Parker and the plaintiffs have resolved their differences, the plaintiffs are still pursuing the Atlantic Surgical Group for Dr. Parker's conduct."

Plaintiffs assert on appeal that because of their settlement with Dr. Parker, the question before the jury should have been whether defendants had proven the negligence of Dr. Parker. They make that argument for the first time on appeal even though in their proposed and revised proposed charges, they stated that plaintiff had the burden of establishing that any defendant had acted negligently. Plaintiffs' settlement with Dr. Parker did not remove from their case his liability because they continued their assertion that Atlantic Surgical Group was liable for his negligence. Thus, they retained the burden of proof as to Dr. Parker's negligence, as the judge correctly charged the jury. Plaintiffs' proposed charge on agency would not have led to a different result, given that the jury found no deviation by the defendant doctors and nurses.

We also find no merit in plaintiffs' challenge to the jury charge and interrogatories regarding Dr. Lake. The verdict sheet contained three questions regarding Dr. Lake's alleged negligence, asking whether he had "deviated from accepted standard of medical practice," "was notified of the plaintiff's increase in abdominal pain," and "was notified of the plaintiff's increase in leg swelling." Plaintiffs' counsel agreed to the jury interrogatories regarding Dr. Lake, advising the judge that he was satisfied with them "[i]f we break them out. The swelling one, and pain one. I don't want the implication that it has to be both in that

question. But other than that, I'm satisfied with that interrogatory being asked." The questions, which were broken out as plaintiffs' counsel had requested, did not specify that the notice of the abdominal pain or swelling had to come from plaintiff; the jury could have found that Dr. Lake was otherwise on notice of those conditions. The jury interrogatories and the charge that followed them accurately reflected the evidence presented at trial and were appropriately tailored to the facts of the case. See Estate of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 591-92 (2015).

### III.

Because the jury found no deviation from a standard of care, we need not consider plaintiffs' arguments relating to proximate cause, damages, or other questions not reached by the jury. Thus, we do not consider plaintiff's arguments regarding Dr. Gingold's testimony or jury charges on Scafidi v. Seiler, 119 N.J. 93 (1990), vicarious liability, or mitigation. To the extent we do not address any of plaintiffs' remaining arguments, it is because we find insufficient merit in them to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Our disposition of plaintiff's appeal renders defendant Lake's cross-appeal moot. Accordingly, we do not address it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5531-17T1